UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Western Division
Criminal No. 05-30047-MAP

------------------------

UNITED STATES

v.

MICHAEL MARRERO, Defendant.

===========================

DEFENDANT'S FIRST MOTION TO COMPEL DISCOVERY AND REQUEST FOR
HEARING

===============================================================

The Defendant, Michael Marrero, respectfully moves this
Honorable Court pursuant to Fed. R. Crim. P., 16, *Brady v.
Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and
*Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d
104 (1972) to order the Government to provide him with the
following information, all as set forth more fully in the letter
from defendant's counsel to the Assistant United States
Attorney, a copy of which is attached hereto:

1.  The request for analysis;

2.  Chain of custody documents;

3.  Analytical data and worksheets supporting the
    laboratory's identification and quantitation of the
    substances in controversy;

4.   Maintenance and calibration logs;

5.   Identification and qualifications of each individual who analyzed or weighted the substances in controversy.

The Government has declined to provide all of the documents requested. See, the letter of the Assistant United States Attorney to defendant's counsel dated December 9, 2005, and filed with the Court that day.

The defendant maintains his request for chain of custody documents, all of the documentation which supports the expert's conclusions about the identity and weight of the substances in controversy, and all of the maintenance and calibration documentation.

As grounds for this motion, the defendant represents and alleges that:

1.   The request for analysis and chain of custody documents are necessary to determine whether or not samples were misidentified or contaminated. The Government says that these documents are unnecessary because the defendant may remedy any inaccurate analysis by the Government through his own expert's reanalysis of the substances in controversy. The Government's response begs the question. The defendant contends that if a sample has been misidentified or contaminated, reanalysis simply confirms the wrong result on the wrong or contaminated sample.

Therefore, the defendant needs these documents to assure himself that the sample he retests is a sample of the substances he allegedly sold.

2.  The defendant maintains his request for all analytical data and documentation which supports identification and quantitation of the analyte(s). This information enables the defendant to determine whether reanalysis of the sample is necessary. For example, the defendant contends that the "crack" form of cocaine base must contain sodium bicarbonate; any other composition makes the substance a form of cocaine base that is not crack. Thus, the defendant may be subject to a mandatory minimum sentence for distribution of cocaine base without being subject to the sentence enhancements specific to crack.

3.  The defendant maintains his request for maintenance and calibration logs for the equipment the Government used to identify and to weigh the substances in controversy. The Government's response, that if the defendant doubts the accuracy of the Government's analysis, the defendant's remedy is to have the material analyzed by his own expert, begs the question. The Government's proposal simply sets up a "war of the experts," and guarantees that the defendant enters the arena unarmed. In the event reanalysis of the substances becomes necessary, the Court

or jury will have to weigh the testimony of each expert.
If the defendant is deprived of information which casts
doubt upon the credibility of the Government's data and
methodology, the Court or jury must choose the expert who
appears more credible. The Government's expert will have
the cachet of the high regard in which the DEA laboratory
is held. See, the December 9, 2005, letter, citing *Belton
v. United States,* 580 A.2d 1289, 1293 (D.C. App. 1990)
["we observed that the chemists who conduct such analyses
do so routinely and generally do not have an interest in
the outcome of trials … and that it is difficult to
perceive any motive or opportunity for the chemists to
falsify their reports."] But see, e.g., Solomon,
Associated Press Article, April 16, 2003, "New
Allegations Cast a Shadow on the FBI Crime Lab;"
USDOJ/OIG Special Report, *The FBI Laboratory: An
Investigation into Laboratory Practices and Alleged
Misconduct in Explosives-Related and Other Cases (April
1997)*, at http://www.fas.org/irp/agency/doj
/oig/fbilab1/fbil1toc.htm. Therefore, evidence that would
allow the defendant to undermine the inherent credibility
of the DEA Laboratory and its employees is exculpatory.

4.  The defendant asserts that he has asked for documents
which the generally-accepted guidelines of the Society of

Forensic Toxicologists and the American Academy of
Forensic Sciences include in its section on "Litigation
Packs." See SOFT/AAFS *Forensic Toxicology Laboratory
Guidelines, §11.10* (2002 final and 2006 (draft)
versions), copies of which are attached hereto.

5.    The defendant contends that the information he seeks is
material to his case. It makes the testimony of
Government experts more or less probative, and it affects
both the determination of guilt or innocence and the
sentence. Given the rather Draconian sentence the
defendant faces (thirty years to life, according to the
Government), the imposition upon the Government pales to
insignificance. Cf. *United States v. Caro-Muniz,* 406 F.3d
22, 29 (1st Cir. 2005). See also, *Norton v. Spencer,* 351
F.3d 1, 8 (1st Cir. 2003)[Impeachment evidence must be
disclosed under *Brady*.]

6.    The defendant further contends that his request is not a
fishing expedition through the Government's files. The
requests are focused; the Society of Forensic
Toxicologists in conjunction with the Toxicology Section
of the American Academy of Forensic Sciences has
recognized the necessity of providing to a defendant the
information he requests. See attachments.

   Dated at Northampton, January 9, 2006.

Respectfully submitted
The Defendant by his attorney
/s/ *Harry L. Miles*
Harry L. Miles, of
*Green, Miles, Lipton & Fitz-Gibbon LLP*
77 Pleasant Street
P.O. Box 210
Northampton, MA 01061-0210
Voice:     413.586.8218
Fax:       413.584.6278
BBO#:      345800

Certificate of Service: I, Harry L. Miles, certify that I have
served a copy of this motion upon Assistant United States
Attorney Paul Smyth by causing it to be mailed to him at the
Office of the United States Attorney, The Federal Building &
Courthouse, Room 310, 1550 Main Street, Springfield, MA 01103,
Tuesday, January 10, 2005.

/s/ *Harry L. Miles*
Harry L. Miles

September 22, 2005


Todd E. Newhouse, Esq.
Assistant United States Attorney
Federal Building & Courthouse
1500 Main Street, Room 310
Springfield, MA 01103


Re:  United States v. Michael Marrero


Dear Mr. Newhouse:

On behalf of my client, I request the following information from
the Government as soon as possible. The information is necessary
to the preparation of the defense and to enable me to render
sound advice to my client.

1.    The request for analysis;
2.    Chain of custody documents which track the sample from
      the time of collection to receipt in the laboratory,
      through analysis and subsequent disposition of the
      sample(s).
3.    All analytical data which supports identification and
      quantitation of the analyte(s), specifically including,
      but not limited to: the raw data, reports, worksheets,
      sequence tables, and quality control data including
      target ranges.
4.    Maintenance and calibration logs for the scales and
      instrumentation used to weigh and identify the
      analyte(s).
5.    Identification and qualifications of each individual who
      participated in the analysis and quantitation of the
      analyte(s).

If the Government declines to provide any of this information
without a Court order, please advise me promptly.

Thank you for your cooperation.

Sincerely yours,


Harry L. Miles



**U.S. Department of Justice**

*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (413) 785-0235*
*Fax: (413) 785-0394*

*Federal Building & Courthouse*
*Main Street, Room 310*
*Springfield, Massachusetts  01103*

December 9, 2005

Harry Miles, Esq.
77 Pleasant Street
Northampton, MA 01061

Re:  <u>United States v. Michael Marrero</u>
     Criminal No. 05-30047-MAP

Dear Attorney Miles:

     In accordance with the government's discovery obligations
pursuant to Local Rule 116.1(C) and 116.2(B) and Fed. R. Crim. P.
16, I am providing you with the following response to your
discovery letter dated September 14, 2005.

     The government has provided, or agreed to provide, the
following items to the Defendant: (1)DEA- Form 7 *Report of Drug
Property Collected, Purchased or Seized*; (2) DEA-86 *Forensic
Chemist Worksheet*(front and back); (3) DEA spectra or
chromatographs generated during the laboratory's analysis; and
(4) the Government expert's summary of testimony and curriculum
vitae.  In addition to being able to review the reports that the
government has already provided, the government will permit the
Defendant to perform his own tests on the cocaine base recovered
from the Defendant.  Rule 16(a)(1)(E) allows the Defendant "to
inspect...tangible objects...if the item is within the
government's possession, custody, or control, and; (i)the item is
materials to preparing the defense; (ii) the government intends

1

to use the item in case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant."  The authority to "inspect" includes the right to an independent weighing, and analyses.  The pertinent issue is whether the Government's results are accurate, not whether the defense's expert would use the same procedures as adopted by the DEA.

The government declines to provide counsel internal agency documents, including maintenance and calibration logs, chain of custody documents.  <u>See</u> Fed.R.Crim.P.  Internal Government documents do not constitute "results or reports" as defined in Rule 16.[1]

---

[1]<u>See</u> <u>United States v. Wilkerson,</u> 189 F.R.D. 14(D. Mass. 1999)(Court denied defense request for "All [DEA] written records, notes, and documentation relating to specimen acceptance, identification, chain-of-possession, transport, receipt, storage, processing, and testing," and "copies of all laboratory procedures utilized in the testing of these specimen(s) including scientific equipment, preparation and verification of chemical or test reagents, step-by-step description or instruction of the testing process, examples of test data produced or obtained by test analysis, criteria for the review of test data, quality assurance and standardization relating to test analysis, as well as a copy of the test analysis data including instrument tracings and computer output obtained from the testing of the specimen(s), standards, control, and blank samples."); <u>United States v. Price</u>, 75 F.3d 1440, 1445 (10th Cir. 1996)(In denying defense Rule 16 motion for internal lab procedures denied as beyond the scope of discovery obligations, the court held, "[t]he language is clear on its face.  It requires the prosecution to turn over 'results or reports' of scientific tests.  The record shows the prosecution turned over...all reports and test results....  The government therefore complied with 16(a)(1)(D), and the court did not abuse its discretion in refusing to permit additional discovery relating to laboratory processes under that part of Rule 16."); <u>United States v. Iglesias</u>, 881 F.2d 1519, 1521-1523 (9th Cir. 1989)(Court denied defense Rule 16(a)(1)(D) motion for "all documents associated with any scientific analysis of any controlled substance seized or otherwise obtained in the course of any investigation leading to or otherwise associated with the prosecution of this case.  This request includes but is not

Courts have recognized the ability of the DEA laboratories to accurately report analytical results.[2]  If a defendant doubts the accuracy of the government's results, his remedy is to have the exhibit tested by his own expert, not to seek the Government's internal reports.

In United States v. Wilkerson,[3] the defendant filed a motion which sought disclosure of a host of information from the Government on its laboratory, including:

> Complete technical procedures relating to all tests
> conducted on the specimen(s) including but not limited
> to tests used to determine the presence and
> concentration and form of drugs or chemicals used to
> prepare or process drugs.  The description of these
> procedures should include copies of all laboratory
> procedures utilized in the testing of these specimen(s)
> including scientific equipment, preparation and
> verification of chemical or test reagents, step-by-step
> description or instruction of the testing process,
> examples of test data produced or obtained by test
> analysis, criteria for the review of test data, quality

---

limited to those records memorializing the storage and transportation of any such substance from the time of seizure or acquisition and thereafter up to and including the trial in this matter" as beyond the scope of Rule 16); United States v. Berry, 670 F.2d 583 (5th Cir. 1982)(defense request for DEA laboratory manual denied as irrelevant); Wolford v. United States, 401 F.2d 331 (10th Cir. 1968)(defense request for step-by-step testing procedures denied).

[2]See e.g. Belton v. United States, 580 A.2d 1289,1293 (D.C.App. 1990)("we observed that the chemists who conduct such analyses do so routinely and generally do not have an interest in the outcome of trials, that they are under a duty to make accurate reports, and that it is difficult to perceive any motive or opportunity for the chemists to falsify their reports.  We therefore concluded that certified Drug Enforcement Agency chemists reports are sufficiently trustworthy to satisfy the purpose of the Confrontation Clause, and that admission of those reports in lieu of the chemist's testimony was constitutionally permissible.") (internal citations and quotations omitted).

[3]189 F.R.D. 14(D.Mass.1999).

assurance and standardization relating to test
analysis, as well as a copy of the test analysis data
including instrument tracings and computer output
obtained from the testing of the specimen(s),
standards, control and blank samples.[4]

In ruling on the defendant's request for the internal
laboratory procedures, the court said the materials were neither
discoverable as "results or reports," nor under Rule 16(a)(2).
The defendant insisted that his materiality claim trumped Rule
16(a)(2), but the court disagreed.  Rule 16(a)(2) acts as a
prohibition against compelled discovery of 'reports, memoranda,
or other internal government documents' even if they could
initially be categorized as 'material to the preparation of the
defendant's defense' as the term is used in Rule 16(a)(1)(C).[5]
The defense may cross-examine on the laboratory's chain of
custody procedures,[6] and the processes which ensure the accuracy
of the laboratory's instrumentation.[7]

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Paul Hart Smyth
_____
Paul Hart Smyth
Assistant U.S. Attorney

_____

[4]Id. at 15.

[5]Id. at 16.

[6] See Defendant's Letter Dated September 22, 2005, #2
("Chain of custody documents which track the sample from the time
of collection to receipt in the laboratory, through analysis and
subsequent disposition of the sample(d).").

[7] See Defendant's Letter Dated September 22, 2005, #4
("Maintenance and calibration logs for the scales and
instrumentation used to weigh and identify the analyte(s).").

<u>CERTIFICATE OF SERVICE</u>

Hampden,  ss.                        Springfield, Massachusetts
                                     December 9, 2005

     I, Paul Hart Smyth, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing by facsimile
to Attorney Harry Miles, 77 Pleasant Street, Northampton, MA.


                              /s/ Paul Hart Smyth
                              Paul Hart Smyth
                              Assistant U.S. Attorney

This story ran on page A2 of the Boston Globe on 4/16/2003.
© Copyright 2003 Globe Newspaper Company.

New allegations cast a shadow on FBI crime lab By John
Solomon, Associated Press, 4/16/2003

WASHINGTON -- Reorganized after controversy in the mid-
1990s, the FBI crime lab is dealing with new allegations of
wrongdoing by employees that have opened the door for
challenges of the lab's science in scores of cases
involving DNA and bullet analysis, internal documents show.
An FBI lab scientist, who connected suspects to bullets
through lead analysis, has been indicted after admitting
she gave false testimony, and a technician has resigned
while under investigation for alleged improper testing of
more than 100 DNA samples, according to records and
interviews. In addition, one of the lab's retired
metallurgists is challenging the bureau's science on bullet
analysis,prompting the FBI to ask the National Academy of
Sciences to review its methodology, the records obtained by
the Associated Press show.

FBI lab director Dwight Adams said detection of the
problems illustrates that reforms are working.  ''The
difference is these are being caught and dealt with
swiftly. Our quality assurance program is in place to root
out these problems, incompetence, and inaccurate
testimonies,'' Adams said. ''These weren't fortuitous
catches; they were on purpose.''

Defense lawyers are already mounting challenges in high-
profile cases handled by the two employees and are
questioning the FBI's project to build a national DNA
database that will help law enforcement identify suspects
based on their genetic fingerprints. The Justice
Department's internal watchdog is investigating FBI lab
technician Jacqueline Blake for allegedly failing to follow
proper scientific procedure when analyzing DNA in at least
103 cases over the past few years, officials said. The
officials said they have found that the technician failed
to compare the DNA evidence with control samples, a
required step to ensure the accuracy of tests. Blake
resigned from the FBI lab recently. Blake's work has become
an issue in a prominent case in New Jersey, where five
police officers are challenging blood evidence she analyzed
that was used to convict them of federal civil rights

violations in the death of a prisoner.

FBI officials have already taken steps to protect the national DNA registry in light of the allegations against Blake and separate revelations of problems in DNA analysis at the Houston police crime lab. FBI officials recently banned the Houston police lab from entering new DNA samples into the national registry. Judges in the Houston area have requested a grand jury investigation into that lab's practices.

**SOFT / AAFS**

# FORENSIC TOXICOLOGY
# LABORATORY GUIDELINES

# 2002

The Guidelines have been copyrighted
by the Society of Forensic Toxicologists, Inc.
and by the American Academy of Forensic Sciences, Toxicology Section.

# 1.    INTRODUCTION

The *Forensic Toxicology Laboratory Guidelines* were originally published in 1991 as two main documents (*Guidelines* plus *Appendix*), plus the self-evaluation checklist.  The primary document, the *Guidelines*, was initially drafted in response to the growth and regulation of forensic urine drug testing.  It was an attempt to take the important issues that were addressed for *Federal Workplace Drug Testing Programs* and draft them into terms which could be more realistically applied to the areas of *Post-Mortem Forensic Toxicology* and *Human-Performance Forensic Toxicology*.  However, the Guidelines Committee agreed that there were many additional issues which were important to cover, but which might better belong in a supplementary document - the Appendix to the Guidelines.  Since 1991, the profession has matured in many ways.  In 1996 the American Board of Forensic Toxicology launched a Forensic Toxicology Accreditation program based primarily on the SOFT/AAFS Guidelines and Appendix.  In 1997 New York State passed legislation requiring the accreditation of all forensic laboratories in the public sector, and others may follow.  The Guidelines Committee concluded that it was time to redraft the original *Guidelines* and *Appendix* into a single cohesive document which would be easier to reference and to update in the future.  That was done, and the final document approved and adopted.  Subsequent changes to the format and content were made and approved in 1998, 2000 and 2002.

**Introduction from 1991 Guidelines**

*In response to the Guidelines for Federal Workplace Drug Testing Programs issued by the U. S. Department of Health and Human Services in 1987, the Society of Forensic Toxicologists and the Toxicology Section of the American Academy of Forensic Sciences appointed a joint committee of members to recommend a supplementary set of guidelines for the practice of forensic toxicology.  The federal guidelines, especially with respect to laboratory personnel and operating procedures, may not always be appropriate for other types of forensic toxicology, and the guidelines set forth below represent recommendations of the Society/Academy committee in response to that issue. These suggestions do not necessarily reflect opinions about the minimum requirement for any laboratory, and have no regulatory purpose; rather, they are intended to assist laboratories engaged in the practice of forensic toxicology in achieving future goals.*

# 2.    SCOPE

The original committee concluded that specific guidelines for the practice of forensic toxicology would be appropriate for two defined areas: **Post-Mortem Forensic Toxicology** and **Human Performance Forensic Toxicology**.

The committee concluded that it was *not* appropriate to include **Forensic Urine Drug Testing**, because that area of practice has been covered by the Department of Health and Human Services Guidelines and by the College of American Pathologists Accreditation program.

The specific aims of the committee, with respect to postmortem and human-performance

forensic toxicology, were to provide detailed guidelines for laboratory practices and to prepare a checklist for self-evaluation that may also serve as an important component of a program designed to prepare a laboratory for accreditation. The self-evaluation checklist has since been dropped, since it was adopted and expanded by the American Board of Forensic Toxicology as part of their laboratory accreditation program in 1996.

## 3.     DEFINITIONS

*Post-Mortem Forensic Toxicology* - determines the absence or presence of drugs and their metabolites, chemicals such as ethanol and other volatile substances, carbon monoxide and other gases, metals, and other toxic chemicals in human fluids and tissues, and evaluates their role as a determinant or contributory factor in the cause and manner of death;

*Human-Performance Forensic Toxicology* - determines the absence or presence of ethanol and other drugs and chemicals in blood, breath or other appropriate specimen(s), and evaluates their role in modifying human performance or behaviour.  (The analysis of ethanol in breath, although important, was not considered by the committee because such tests are not conducted in a laboratory setting); and

*Forensic Urine Drug Testing* - determines the absence or presence of drugs and their metabolites in urine to demonstrate prior use or abuse.

*Standard* -  a reference material possessing one or more properties that are sufficiently well established that it can be used to prepare calibrators.

*Calibrator* - a solution , either prepared from the reference material or purchased,  used to calibrate the assay. Where possible, calibrators should be prepared in a matrix similar to that of the specimens.

*Control* - a solution  either prepared from the reference material (separately from the calibrators; that is, weighed or measured separately), purchased, or obtained from a pool of previously analyzed samples.  Controls from any of these sources are used to determine the validity of the calibration; that is, the stability of a quantitative determination over time.  Where possible, controls should be matrix-matched to specimens and calibrators, as indicated above.

*Reference Material (RM)*  -  a material or substance one or more properties of which are established sufficiently well to be used for calibration of an apparatus, assessing a measurement or assigning values to material.  (AOAC Official Methods of Analysis (1984)).
*Certified Reference Material (CRM)*  - a reference material, one or more of whose properties are certified by a valid procedure, or accompanied by or traceable to a certificate or other documentation which is issued by a certifying body.  (AOAC Official Methods of Analysis (1984)).

## 4.    PERSONNEL

### 4.1    Laboratory Director

4.1.1    The forensic toxicology laboratory should be directed by a person who is qualified by reason of appropriate education and experience to assume the required professional, organizational, educational, managerial and administrative responsibilities.

4.1.2    That education and experience should be comparable to those of persons certified as Diplomates by the American Board of Forensic Toxicology.

4.1.3    Alternative acceptable qualifications include a doctoral degree in one of the natural sciences and at least three years of full-time laboratory experience in forensic toxicology; or a Master's degree in one of the natural sciences and at least five years of full-time laboratory experience in forensic toxicology; or a Bachelor's degree in one of the natural sciences and at least seven years of full-time laboratory experience in forensic toxicology.

4.1.4    The director should also have documented training and/or experience in the forensic applications of analytical toxicology (such as court testimony, research, participation in continuing education programs, and/or peer review of appropriate manuscripts in the field), including a knowledge of evidentiary procedures that apply when toxicological specimens are acquired, processed, and stored and when toxicological data are submitted as part of a legal proceeding.

4.1.5    The laboratory director should be responsible for ensuring that the  laboratory personnel are adequately trained and experienced to conduct the work of the laboratory

4.1.6    The laboratory director should be responsible for maintaining the competency of laboratory personnel by monitoring their work performance and verifying their skills.  This training and experience should be documented.

4.1.7    The laboratory director should be responsible for the development of a complete, up-to-date procedures manual that is available to and followed by all personnel performing tests.

4.1.8    The laboratory director should establish a procedure for validating new analytical methodologies, and for maintaining a quality assurance program to ensure the proper performance and reporting of all test results.

4.1.9    Since forensic toxicology laboratories handle controlled substances and generate results essential to the criminal justice system, the director, to the extent practical or permitted by law, should exert reasonable efforts to ensure that all personnel meet high ethical and moral standards.

### 4.2    Other Laboratory Staff

The range and type of duties of other laboratory personnel will vary according to the size and the scope of the laboratory.  It is recommended that each laboratory should have the following.

4.2.1    A person with the title of deputy director, assistant laboratory director, assistant chief toxicologist, or supervisory toxicologist, who has sufficient training and experience to be familiar with all administrative and testing procedures.  He or she may supervise the work of all analysts, and should be capable of performing full scientific review of all test data, and of acting for the laboratory director in the director's absence.   It is recommended that such individuals should have a minimum of a Bachelors degree in a natural science and 3 years of training in analytical toxicology, at least 1 year of which is in forensic toxicology.

4.2.2    One or more technicians who are capable of performing a variety of test procedures for alcohol, drugs, and other chemicals.  A technician may supervise and review the work of less experienced technicians, and may supervise a section in a larger laboratory.  It is recommended that such individuals should have a minimum of a Bachelor's degree in a natural science, at least 1 year of experience in analytical toxicology and 6 months experience in the present employment.

4.2.3    One or more analysts who are capable of performing tests for one or several analytes, and who are certified in each procedure by the laboratory director.  These analysts may be limited in function to perform specified tasks - for example, an analyst who performs only immunoassays.


## 5.    STANDARD OPERATING PROCEDURES

5.1    The laboratory should have a standard operating procedure manual (SOP) that is complete, up-to-date, and available to all personnel who are performing tests.

5.2    The SOP manual should include detailed descriptions of procedures for sample receiving, accessioning, chain-of-custody, analysis, quality assurance and quality control, review of data, and reporting.

5.3    The SOP manual should include administrative procedures as well as analytical methods and be reviewed, signed, and dated whenever it is first placed into use or changed.

5.4    The SOP manual should include, for each analytical procedure if appropriate, the following:  a) theory and principle of the method, b) instructions for preparation of reagents, c) details of the analytical procedure, d) instructions for preparation of calibrators and controls, e) information about any special requirements for handling reagents or for ensuring safety, f) validation parameters (e.g. LOQ, linearity), g) criteria for the acceptance or rejection of qualitative or quantitative results and h) references.

5.5    When the required documentation is not available for infrequently performed assays, it should be added as each is performed for the first time.

5.6    The laboratory should maintain out-dated copies of the SOP manual and provide a means for their retrieval from archival storage.


## 6.    SAMPLES AND RECEIVING

### 6.1    Specimen Collection and Labelling

The proper selection, collection, and submission of specimens for toxicological analyses is of paramount importance if analytical results are to be accurate and their subsequent interpretation is to be scientifically sound and therefore useful in the adjudication of forensic cases.  These guidelines can apply equally to investigations by Medical Examiners or Coroners (postmortem forensic toxicology) and to investigation by law-enforcement agencies of drivers suspected of being under the influence of alcohol or other drugs.

6.1.2   The director should develop and provide detailed guidelines and instructions to all agencies or parties the laboratory serves.

6.1.3   Instructions should state the types and minimum amounts of specimens needed to accomplish the requisite analyses and subsequent interpretations.

6.1.4   Whenever possible, the amount of specimen collected should be sufficient to ensure that enough remains for subsequent re-analysis if required.

6.1.5   Instructions should include specific requirements for the type and size of specimen containers and, if appropriate, the type and amount of preservative to be added to biological fluids.

6.1.6   Instructions for labelling individual specimen containers, and acceptable conditions for packing and transportation, should also be provided.

6.1.7   Submitting agencies should be instructed on how to label clearly all samples from living subjects or decedents who may carry a highly infectious disease such as tuberculosis, hepatitis or Human Immunodeficiency Virus.

6.1.8   Each specimen should be identified as to type.  For blood, the anatomical site of collection should be stated.  When antemortem and/or perimortem specimens are available from a decedent, each specimen should be labelled with the time and date of collection.

6.1.9   The name of the subject from whom the specimens were collected should appear on each label together with other appropriate identification; for example, the Medical Examiner's Case Number and/or the subject's Social Security Number.

6.1.10  Where provided, the time and date registered for each specimen should be initialled or signed by a responsible person who performed or witnessed the collection and who assumes

responsibility for the chain of custody.

## 6.2  Specimen Handling

6.2.1   A chain-of-custody form should be designed that will accompany specimens from the place of collection to the laboratory.  This document may be incorporated in the laboratory-request form.

6.2.2   Handling and transportation of a specimen from one individual or place to another should always be properly documented.

6.2.3   The chain-of-custody section should be properly completed by responsible personnel at the time the specimens are collected.

6.2.4   Every effort should be made to minimize the number of persons handling a specimen.

6.2.5   Individual specimens should be transported and stored in such a manner as to minimize the possibility of degradation, contamination, tampering and/or damage in shipment.

6.2.6   The condition of the external package should be documented upon receipt at the laboratory, either on the requisition form that accompanies the specimen(s), in the log book, on the external chain-of custody form, or on other documents that constitute normal laboratory records.

6.2.7   Acceptable means of transporting specimens to the laboratory may include hand-delivery, national postal service, or a private or government courier service.

## 6.3  Specimen Receipt

6.3.1   The means of delivery of specimens should be recorded by the receiving laboratory.

6.3.2   Shipping containers should be opened only in a secure area and only by an individual designated to record receipt of specimens.  A "secure area" may be defined as an area to which unauthorized individuals do not have access without escort by authorized personnel.

6.3.3   A hard copy of the specimen-receipt record should be permanently maintained; this record may be computer-generated, typed, or hand-written.

6.3.4   Specimens should be logged-in immediately upon receipt.

6.3.5   The integrity of the individual specimen container should be checked as should the condition of each specimen. Discrepancies should be recorded.

## 6.4  Recommended Amounts of Specimens

6.4.1    Post-Mortem Forensic Toxicology Specimens:   In death investigations, the types and minimum amounts of tissue specimens and fluids needed for toxicological evaluation of the role of drugs and other toxic chemicals are frequently dictated by the analyte or analytes that must be identified and quantitated.   For example, in the evaluation of carbon monoxide poisoning, 10 mL of whole blood would be sufficient with adequate specimen volume remaining for re-analysis if required.   On the other hand, to evaluate the role of amitriptyline in a death, 25 gm of liver, 10 mL of heart blood, 5 mL of peripheral blood and the entire gastric contents should be made available.

Many deaths involve ingestion of multiple drugs, necessitating larger amounts of tissue and fluids to be collected at autopsy for toxicological examination. The following is a suggested list of specimens and amounts to be collected at autopsy in such cases:

| | |
|---|---|
| Brain | 100 gm |
| Liver | 100 gm |
| Kidney | 50 gm |
| Heart Blood | 25 mL |
| Peripheral Blood | 10 mL |
| Vitreous Humor | All Available |
| Bile | All Available |
| Urine | All Available |
| Gastric Contents | All Available |

Unique poisons may dictate the need for other specimens, e.g. lung and intestine.  Such cases should be addressed on an individual basis.  However, the amount of specimen routinely collected should be sufficient to allow re-analysis for one or more analytes at a later time, should the need arise.

6.4.2    Human Performance Forensic Toxicology Specimens:   As defined earlier, this activity encompasses the identification and quantitation of ethanol and other drugs and chemicals in blood, breath or other appropriate specimens for evaluation of their role in modifying human performance and behaviour. The analysis of breath ethanol was not considered by this Committee.

Although in many instances the analytes are clearly specified in advance in human performance forensic toxicology testing, the spectrum of drugs and chemicals may potentially approach those encountered in postmortem toxicology.    Because of this and remembering the difficulties involved in obtaining samples from living persons, it is recommended that a minimum of 15 mL of  blood be collected for toxicological analysis.

Urine may also be submitted for testing; a minimum volume of 30 mL is recommended.  It must be emphasized that neither qualitative nor quantitative analysis of urine permits an evaluation of the effect of the drug or chemical on human behaviour.   If other specimens are submitted and analyzed, any conclusions regarding drug use or effects on human behavior should be based only on appropriate validated scientific studies.

## 7.        SECURITY AND CHAIN-OF-CUSTODY

### 7.1    The Laboratory

7.1.1    Access to the forensic toxicology laboratory should be limited. The laboratory director should authorize and document the personnel able to enter designated areas.

7.1.2    Unauthorized personnel should be escorted and may be required to sign a log-book upon entry and departure from the laboratory, recording the time, date and purpose of the visit.

7.1.3    The physical layout of the laboratory must be such that unauthorized personnel cannot enter without detection.

### 7.2    Specimens

7.2.1    Receipt of specimens should be indicated by signature, and date and time of individuals receiving the specimens.

7.2.2    Specimens received should be labeled with the name of the decedent or suspect, case number, specimen type (e.g. blood) or unique identifier, date specimen taken and identification of the individual taking the sample.

7.2.3    Specimens must be stored in a secure manner.

7.2.4    For the maintenance of specimen security it is recommended that, where possible, the laboratory have a separate accessioning area.  In this area, specimens are received, assigned accession numbers, aliquots removed and/or stored in refrigerator/freezers.

7.2.5    Any transfer of specimens, or portions thereof that are removed for analysis, must be documented as part of the permanent laboratory record.

7.2.6    It is recommended that chain of custody documentation reflects not only the receipt of the specimen from an outside source, but also transfers of the specimen or an aliquot thereof, within the laboratory. If multiple specimens are involved, a batch form may be used.

7.2.7    An aliquot or a batch of aliquots chain of custody may be used for indicating the transfer of portions of specimens for testing.  This form should indicate the date, the test for which the aliquot was taken, the laboratory accession numbers, the identity of the individual obtaining the aliquots and the identity of the individual to whom the aliquots were given, if applicable.

7.2.8    Specimens may be transferred to a secure long-term refrigerator/freezer after analysis. Transfers between storage areas and/or subsequent disposal should be documented. The laboratory should develop a standing operating procedure for retention and disposal of

specimens. This procedure should reflect local, state, or federal regulations.

7.2.9   The laboratory should maintain a written policy and instructions pertaining to retention, release and disposal of specimens.


# 8.    ANALYTICAL PROCEDURES

## 8.1   Confirmatory Tests

8.1.1   As a general matter of scientific and forensic principle, the detection or initial identification of drugs and other toxins should be confirmed whenever possible by a second technique based on a different chemical principle.

8.1.2   Where possible, the confirmatory (second) test should be more specific and sensitive than the first test for the target analyte.  The use of mass spectrometry is recommended as the confirmatory technique, where practical.

8.1.3   In some circumstances, confirmation using the same GC system as the first might be acceptable if chemical derivatization (e.g. silylation or acylation) is used to change the retention times.  However, confirmation using a second GC system with a similar though not identical column, is not usually acceptable since the retention indices of many analytes may not differ substantially from one system to the other (e.g.  DB-1 and DB-17).

8.1.4   Use of a second immunoassay system (e.g.  RIA) to confirm another immunoassay (e.g. FPIA) is not regarded as acceptable, even though the assays differ somewhat in principle.  The rationale for this is that the analytes which cross-react with one assay are also likely to cross-react in the second assay because the antibodies may be raised to the same drug or closely related substance.

8.1.5   A second immunoassay with different cross-reactivity may sometimes be used to augment the initial screen (for example a broadly cross-reacting opiate immunoassay, followed by a second immunoassay with more specific cross-reactivity to unconjugated morphine).  These results would normally still require confirmation with a more specific method (e.g. GC/MS).

8.1.6   It is a good practise to confirm the identity of an analyte in a different extract of the same specimen from that used for the first test, or in a second specimen.   However, confirmation of a drug or toxin in the same original extract of a single specimen would not normally be regarded as acceptable, since that would not rule out the possibility that the extract became contaminated during the extraction.

8.1.7   The quantitation of an analyte may serve as acceptable confirmation of its identity if it was initially detected by a significantly different method (e.g. GC/MS SIM quantitation of a drug detected by immunoassay).

8.1.8    Where mass spectrometry is used in selected ion monitoring mode for the identification of an analyte, whether as part of a quantitative procedure or not, the use of at least one qualifying ion for each analyte and internal standard, in addition to a primary ion for each, is strongly encouraged where possible.  Commonly used acceptance criteria for ion ratios is ±20% relative to that of the corresponding control or calibrator.  However, it is recognized that some ion ratios are concentration dependent and that comparison to a calibrator or control of similar concentration may be necessary, rather than an average for the entire calibration.  Ion ratios for LC/MS assays may be more concentration and time dependent than for GC/MS and therefore acceptable ion ratio ranges of up to ±25% or 30% may be appropriate.

8.1.9    GC/MS chemical ionization and LC/MS mass spectra are often simpler than GC/MS EI spectra and therefore afford less options for the choice of qualifier ions.  However, it is often possible to adjust the ionization energy (e.g. cone or fragmentor voltage in LC/MS) in order to produce additional or stronger secondary ions.  Running the sample under conditions of both weak ionization (to maximize the quantitation ion signal) and stronger ionization (to promote fragmentation and facilitate confirmation of identity) is an option.

8.1.10  It is recommended that at least the presence of a drug or toxin be verified in more than one specimen, or if only one specimen is available by replicate analyses on different occasions and with adequate positive and negative controls in the same matrix. However, it is acknowledged that an analyte will not necessarily be present in all specimen types.

8.1.11  Use of a second confirmatory technique is encouraged for all analytes, including ethanol (e.g.  GC, ADH, or colorimetric) and carbon monoxide (e.g. visible spectrophotometry, palladium chloride or GC).

8.1.12  It is recognized that in some circumstances a suitable second test procedure is not available and the probability that the first test is incorrect is almost zero.  For example, the probability that a 75% carboxyhemoglobin in a well-documented suicide is incorrect, when obtained by a properly conducted spectrophotometric assay, is exceedingly low. However, the unexpected finding of a 30% carboxyhemoglobin from a motor vehicle accident victim by a similar determination in blood holds a lower degree of certainty.


8.2      **Method Calibration and Validation**

8.2.1    When conducting analyses, laboratories may group specimens into batches.  Each batch should contain a sufficient number of calibrators and controls, the total number of which will depend on the size of the batch and the nature of the tests.

8.2.2    When analyses are being performed on unusual specimens (decomposed tissue, vitreous fluid, etc.),  appropriate matrix-matched calibrators should, when possible, be prepared and tested concurrently with the specimens.

8.2.3    For immunoassays, a laboratory should, at a minimum, be able to demonstrate that the blank or negative calibrator plus two standard deviations does not overlap with the cut-off or the lowest positive calibrator.  Alternatively, the laboratory may determine the limit of detection (LOD) by determining the mean value for the blank and adding three standard deviations to this value (LOD = Xm + 3SD).   However, it should be noted that for other assays (e.g. GC, HPLC) the true LOD may be higher than indicated by this formula if significant adsorption or other losses occur.  For example, in chromatographic assays, the LOQ might be the smallest blood concentration of a drug needed to give a peak height three times the noise level of the background signal from a blank blood sample. Alternatively, for infrequently performed assays where the analyte measured is always within the calibration range of the assay and well above the LOD, it may be sufficient to indicate that the detection limit is "less than" a certain value. Thus the true LOD may be derived experimentally, but should not be less than the blank plus three standard deviations.  The limit of quantitation (LOQ) may be derived by adding ten standard deviations to the true value of the blank.  However, it is preferable to determine the LOQ experimentally as the lowest concentration for which an acceptable coefficient of variation can be routinely achieved.

8.2.4    For chromatographic assays, the LOD and LOQ may be administratively defined in terms of the concentration of the lowest calibrator, and therefore may not need to be determined experimentally.  However, if results are reported below the value of the lowest calibrator, LOD and LOQ should be determined.

8.2.5    The use of a suitable internal standard for all chromatographic assays (e.g. GC, HPLC, GC/MS) is recommended.  The internal standard should have chemical and physical properties as similar to the analyte as possible.  If the analyte is to be derivatized, an internal standard should be chosen which will form an analogous derivative.   Stable isotope (e.g. deuterated) standards are recommended for GC/MS assays, although well chosen non-deuterated internal standards may occasionally give equivalent or better performance.  The internal standard should be added to the sample at the earliest possible stage in the method, and in any event before buffering and extraction of the sample.  Markers which are added after the initial extraction are regarded as "external standards" and are discouraged.

8.2.6    Linearity of the procedure should be established by typically using at least three calibrators.  The concentration of the calibrators should be such that they bracket the anticipated concentration of the specimen(s).   If the concentration of the specimen exceeds the concentration of the highest calibrator, the specimen should be diluted and re-extracted if accurate quantitation is required.   Otherwise the specimen should be reported as having a concentration greater than the highest calibrator.  If the concentration of the specimen should be less than that of the lowest calibrator, an additional calibrator should be set up which falls below the expected range of the analyte in the sample.  Alternatively, the volume of the specimen may be doubled and re-extracted if it can be demonstrated that the assay is not matrix dependent.   If an accurate quantitation is not necessary, then the specimen can be reported as containing the analyte at less than the lowest calibrator (as an alternative to the term "trace amount").  It is acknowledged that some assays are inherently non-linear and that the use of quadratic or other mathematical models may be necessary.

8.2.7    Criteria for acceptance of a chromatographic calibration should be stated in the method. For a multi-point calibration this factor is usually the correlation coefficient.  For most applications, an acceptable correlation coefficient is 0.99.  However, there may be circumstances where a correlation coefficient of 0.98 is minimally acceptable.  In addition, it is good practice to evaluate the range of the calibration by calculating the value of each calibrator against the curve.  Values of $\pm20\%$ are generally acceptable for most applications, although $\pm10\%$ are preferred for analytes such as ethanol.  Single point calibrations are discouraged unless controls are used at or close to the upper and lower quantitative reporting limits.

8.2.8    For specimens having concentrations significantly higher than the highest calibrator, the laboratory should exercise precautions so that carry-over of analyte into the next specimen does not occur.  Similarly, specimens with very low concentrations should be checked to ensure that carry-over from a previous very high positive has not occurred.

8.2.9    It is recognized that for a variety of reasons occasional analytical results will be "outliers"; that is, analytical values which deviate significantly and spuriously from the true value.  "Outlier" results of control, blanks or calibrators should be obvious.  However "outlier" results of case specimens may not be identified if only run singly, unless that result can be compared with one from a separate analytical determination.  For this reason replicate extraction and quantitative analysis, at least in duplicate, is recommended.   The laboratory should determine the acceptable criteria for replicate analysis.  A maximum deviation of $\pm20\%$ of the mean is recommended.

8.2.10  Retention time should be part of the acceptance criteria for chromatographic assays.  For GC based assays, deviations of 1 - 2% from the calibrators or controls may be acceptable.  Slightly larger deviations may be acceptable for HPLC based assays, particularly where the mobile phase is being programmed non-isocratically.

## 8.3    Method of Standard Additions

It is recognized that the matrix of some forensic specimens may be "unique" in some way (e.g. putrefied or embalmed) such that it is difficult or impossible to obtain a similar matrix for the preparation of reliable calibrators and controls.  In these circumstances, the use of a "standard addition" procedure may be preferable to a conventionally calibrated assay.  In the method of "standard addition" known amounts of analytes are added to specimen aliquots and quantitation performed by comparing the proportional response of the fortified aliquots with that of the unknown specimen.  Use of an internal standard and a multiple point calibration is strongly recommended.

## 9.    QUALITY ASSURANCE AND QUALITY CONTROL

## 9.1    Quality Assurance

9.1.1    Quality assurance encompasses all aspects of the analytical process, from specimen collection and reception through analysis, data review and reporting of results.   It includes, but should not be limited to, quality control of each analysis and proficiency testing of the laboratory.

9.1.2    Quality assurance assumes a unique role in the forensic science disciplines because results are subject to challenge in the "adversarial" justice system. One purpose of a quality assurance program is to detect error, whether random or systematic, and to initiate appropriate remedial action.

9.1.3    Standards used should be appropriate for the test being performed, and documentation should be maintained describing their sources and dates of acquisition.  Reference material should be stored so as to ensure its stability and integrity.  If a standard is prepared in the laboratory, the source(s) of the chemical reagent(s), the method of preparation, and verification of the final product should be recorded and maintained on file.

9.1.4    Where practical, the identity and purity of reference materials should be verified by the laboratory.

9.1.5    Labelling should be uniform for all standards and reagents.  Date of acquisition or preparation, and the initials of the preparer, should be included on the label. The expiration date should always appear on the label. An expiration date furnished by a vendor/manufacturer determines the useful lifetime of the standard/control unless it can be verified beyond that date.

9.1.6    Initially, a sufficient number of calibrators should be run to determine the characteristics of the calibration curve; a blank and at least three calibration points are recommended for the initial calibration process.   The stability of the calibration curve should be tested under laboratory conditions by the addition of controls, both positive and negative.

9.1.7    Controls are not analyzed for calibration purposes.  As a general rule an adequate set of controls should include, at a minimum, a specimen that does not contain the analyte (defined as a negative control) and a specimen containing the analyte at a concentration that realistically monitors the performance of the assay.  Additional controls can be used to test the linearity of the calibration over the desired range.

9.1.8    The SOP manual should specify corrective action to be taken when control results are outside acceptable limits.  Under optimal conditions a laboratory should have a quality control supervisor, but having a staff member dedicated to quality control may be impractical for small laboratories.

9.1.9    Forensic toxicology laboratories should participate in an external proficiency testing program which includes, at a minimum, a proficiency testing program for alcohol in blood or serum, and for drugs in at least one type of specimen; the program should realistically monitor the laboratory's quantitative capability.

9.1.10  The laboratory director should regularly review results of quality control and proficiency testing.  Signing and dating the record constitutes appropriate evidence of review.  It is important that bench personnel be informed of quality control and proficiency test results. Attention should be given to procedures for monitoring potential sources of error.  Proficiency test materials should be retained until the summary report is received and any corrective action satisfactorily completed.

9.1.11  Appropriate and timely corrective action in the event of proficiency test errors is essential.  False positive errors are the most serious and possible causes of the error must be thoroughly investigated, including contamination of glassware and carry-over.  A false negative result can be defined as failure to detect a substance which the laboratory claims to be able to detect, or that should have been detected by the method.  By this definition, a false negative indicates a failure that should be investigated expeditiously.  A false negative can also occur because the routine methods of the laboratory will not detect the analyte at all, or at the spiked concentration.  In this instance the laboratory director should decide whether the analytical procedures need revising, or whether the failure to detect that analyte at the spiked concentration is acceptable (e.g. the concentration is below that of toxicological interest).  All corrective action should be documented.

9.1.12  Quantitative proficiency test errors should also be investigated.  Usually, the target concentrations of analytes are expressed in terms of the mean value for all participants in the survey, plus or minus 1 SD or 2 SD.  Occasionally, the weighed-in target may be disclosed. Where the magnitude of an error is large, the need for corrective action is obvious and the underlying cause may be easy to determine.  For some analytes, especially those infrequently quantitated, 2 SD, a common measure of acceptability, may represent an unacceptably large percentage deviation from the mean.  Therefore, a realistic percentage deviation should be used, such as $\pm 20\%$ or $\pm 30\%$.  Depending on the magnitude of the error, corrective action may be as simple as review of the assay results to ensure that the calibration was valid, that the assay was in control, and that any transcriptions were accurate.  For more serious errors, corrective action may require repeating the analysis, re-validation of the assay, or even redevelopment of the test. All corrective action should be documented.

9.1.13 Routine maintenance of equipment is an important part of any quality assurance program.  It is a good practice to document all routine and non-routine maintenance, including tasks such as changing septa and liners on GCs.  Documentation may be in a logbook, which can be kept by larger equipment, or check-sheets filed in a ring binder.  Multiple items of similar equipment (e.g. pipettors) should be labelled in order to readily differentiate them.

## 9.2    **Quality Control**

9.2.1   <u>Control Materials</u>:   In the true sense, a control is a test sample, identical to the unknown, but containing the analyte at a known concentration.  With each batch of specimens, whether a single specimen or multiple ones, controls would be carried through the procedure in  parallel with the unknowns.   It is suggested that each batch of specimens include at least 10% controls. The controls must include one positive and one negative control.  For qualitative assays positive

and negative controls, acceptable results may simply be "positive" or "negative", respectively. For quantitative assays, negative controls should give results that indicate the analyte is absent, or below the LOD for the assay. An acceptable positive control result of ±20% is recommended for most drugs, except for controls that are at or close to the LOQ of the assay, when ±25-30% may be more realistic. The control must give a result within a predetermined deviation from its mean value, or the test is deemed "out of control" and therefore, the result generated from the unknown specimen is unacceptable.

9.2.2   It is a common and accepted practice in clinical laboratory work to obtain or prepare material and then establish the target range by replicate analysis of the control in parallel with existing QC material. For example, control material may be prepared by pooling specimens from multiple cases. While that approach is still accepted in forensic toxicology, it is scientifically less desirable than preparing or purchasing control material with a specific weighed-in target concentration, which will allow independent verification of calibration accuracy. If control target ranges are experimentally determined, it is important for that range to be verified against control material, prepared commercially or independently in-house, prior to it being put into routine use.

9.2.3   For some forensic toxicology procedures, providing a true control is no more difficult than any other test. For others, however, in which the matrix may be unique (e.g. decomposed tissues, bone, hair or nails) , providing a control is not only difficult, but can never approach the ideal of being identical to the unknown specimen. Controls should be prepared from standard material from a different source than that used in calibration of the assay. Where this is not practical, the control should at least be prepared using a different weighing or dilution than that used to prepare the calibrators. Control material prepared from the same solution used to prepare the calibrators is unacceptable, since any errors made in preparation of the standard solution will not be detected.

9.2.4   <u>Open Controls</u>:  Open controls are those whose identity and expected result are known to the analyst. They can be purchased from commercial vendors, prepared in the laboratory, distributed by professional organizations or saved and pooled from former cases. Regardless of the source, the concentration of the analyte in the control must be validated.

For tissue specimens or other unusual matrices, more innovative approaches may be necessary. Fortifying drug-free matrices, such as tissue homogenates, out-dated blood bank blood, plasma to simulate the unknown specimen is acceptable.  A "blank" or negative control may, of course, be the unfortified matrix.

9.2.5   Results from quantitative quality control material should be recorded in a manner that readily permits the detection of trends such as the deterioration of reagents, calibrators or controls. For frequently run controls, results may be plotted in a graphical manner such as a Levy-Jennings plot. For less frequently run material, tabulation is acceptable. Determination of the coefficient of variation for the controls may give useful information about the precision of the assay, and may indicate which assays need further development.

9.2.6    Blind Controls:    As the name implies, these are identical to open controls except their identity is unknown to the analyst.  It is generally recognized that this is the ideal way to maintain quality control.  A blind control should test the entire laboratory process including receiving, accessioning, analysis and reporting.   This can be accomplished by setting up a "dummy account" or by co-operation with the submitting agency.  Such blind controls are sometimes called "double blinds".  A more practical approach is to have the accessioning section insert blind controls into each batch of specimens.  However, either of these processes can be difficult to accomplish in a small laboratory; they are both costly and time consuming.

9.2.7    Sources of Information:    There are many good references relating to the general topic of quality control as well as to specific application relating to analytical procedures.  These include: *Tietz Textbook of Clinical Chemistry*, 3rd edition, by Carl A. Burtis, Edward R. Ashwood, Norbert W. Tietz, Adrianne Williams (Editors), W.B. Saunders Co., Philadelphia, 1998; *Cost-Effective Quality Control: Managing the Quality and Productivity of Analytical Processes*, by James O. Westgard and Patricia L. Barry, AACC Press, Washington DC, 1986; *Quality Assurance in Postmortem Toxicology* by Wilmo Andollo, Chapter 12.5 in *Handbook on Drug Abuse*, Steven Karch senior editor, W. Lee Hearn section editor, CRC, Boca Raton, FL, 1998, pp 953-969.

## 9.3    Reference Materials

9.3.1    The National Institute of Standards and Technology (NIST), formerly the National Bureau of Standards (NBS) , refers to these as Standard Reference Material (SRM).  For example, a specific RM may have a melting point of such sharpness and reproducibility that it can be offered as an RM for the calibration of a thermometer in a melting point apparatus. However, it may not be appropriate for preparing a calibration curve.  A CRM, or SRM, suitable for the preparation of a standard to which calibration material can be compared, must be certified by a method generally recognized by the scientific community as one which validates the CRM for this purpose. The nature of the procedure depends, of course, on the properties of the analyte.

9.3.2    Several different organizations supply CRMs of a variety of types. A complete listing of organizations supplying CRMs is available from the International organization for Standardization, American National Standards Institute, 1430 Broadway, New York, NY 10018. Catalogs or literature describing CRMs are available from individual organizations, such as the NIST.

9.3.3    It is important to remember that most RMs are not 100% pure.  The label or package insert should indicate the purity or the nature of the contaminants or the degree of water of hydration.  Further instructions may provide guidance as to how the RM is to be used.  For example, perhaps it must be protected from light, or stored at a low temperature or protected from moisture.  These instructions must be carefully followed in order to use the RM according to its specifications.

9.3.4    Drugs, perhaps more than many other chemicals, may have limited shelf-lives. Degradation due to photo-reactions, oxidation in the air or by other means, requires that periodic

assessment of these changes must be monitored.  Methods for detecting such changes are varied but even RMs may not retain their original purity.  RMs supplied in solution may have more limited stability than those supplied as pure, dry, solids.

9.3.5   The importance of acquiring pure chemicals used as standards and periodically monitoring their purity, requires the development and implementation of procedures which are part of the standard operating procedure of the laboratory.   The steps which can be used are summarized as follows:

   1)   maintain instruments and all measuring devices at optimal performance with regular calibration checks.
   2)   acquire chemicals to be used as standards from reliable sources who validate the stated purity, preferably by a certifiable trace to a CRM or SRM, or
   3)   acquire chemicals as RM, carefully following any instructions accompanying the RM for maintaining anhydrous conditions or to avoid deterioration, or
   4)   acquire chemicals from other sources but always assess the purity of the material by appropriate measurement of physical constants and/or instrumental methods.
   5)   regardless of the source of the chemical for preparation of the standard, devise a means by which the standard can be monitored periodically in order to detect any deviation from its original purity.
   6)   before using a newly prepared standard, compare its properties with a previously validated standard or with a CRM or SRM.

## 9.4   Metabolites

9.4.1   Many testing procedures, particularly immunoassay tests, are targeted to detect drug metabolites.  As might be expected, these are more difficult to obtain in pure form, free of interferences and certified as to their authenticity.  A number of commercial sources offer drugs and some metabolites, together with deuterated forms useful as internal standards in GC-MS.  Frequently the commercial sources will supply a statement of purity with the material.  This is not the same as a CRM or SRM, but after verification of purity, may be quite acceptable.

9.4.2   Metabolites of pharmaceutical drugs can, at times, be obtained from the company which manufactures them.  This often requires a personal contact with an appropriate official of the company, completion of necessary paperwork and some time delay.   The *Physicians' Desk Reference* in its "Manufacturers' Index" lists names and telephone numbers of contact officials.

9.4.3   When the identity of the metabolite has been described in a reputable scientific journal, but no source is evident, a search of catalogs from suppliers of organic chemicals may be fruitful. If this is not successful, then it may be necessary to synthesize the metabolite.  In this case its identity should be confirmed by standard, acceptable methods.  In all of these alternatives, purity must be assessed.

## 10.   REVIEW OF DATA

10.1    Before results are reported, each batch of analytical data should be reviewed by scientific personnel who are experienced with the analytical protocols used in the laboratory.  At a minimum this review should include:

*     chain-of-custody documentation
*     validity of analytical data (e.g., shape and signal-to-noise ratio of chromatographic peak) and calculations
*     quality control data.

10.2    Where possible, the results should be reviewed in the context of the case history, autopsy findings and any relevant clinical data.  The review should be documented within the analytical record.

## 11.    REPORTING OF RESULTS

### 11.1    General Recommendations

11.1.1  Many, if not most, forensic toxicology laboratories are an integral part of state or local government supported, medico-legal investigative agencies, or are associated with them.  Each laboratory must follow the mandates of the particular agency and/or governmental sub-division when reporting results.  Thus, while it is neither possible nor desirable to suggest a uniform format for reports, they should include all information necessary to identify the case and its source, and should bear test results and the signature of the individual responsible for its contents.

11.1.2  The following recommendations are made:

1) name and/or identification number
2) laboratory identification number
3) name of submitting agency or individual
4) submitting agency's identification number
5) date submitted
6) date of report
7) specimens tested
8) test results
9) signature of approving individual

11.1.3  Although most forensic toxicology reports are confidential and often sensitive in content, some jurisdictions may treat the report as an official public document.  If the results are confidential, every precaution should be exercised to ensure that a properly authorized person receives the information when it is transmitted by telephone, computer, FAX, or any other method different from conventional delivery of a written report.  Each laboratory should formulate its own policy for retention or release of information and for response to requests for

its documentation.

## 11.2    Terminology in Reports

11.2.1  "Positive" indicates that a particular substance has been identified in accordance with the laboratory protocols. "Negative", "Not Detected", or "None Detected" has been generally used to indicate the absence of an analyte or analytes.  "None detected" is preferable.  This indicates that particular substances were absent within the limitations of the test(s) performed.

11.2.2   Tests may be described in a number of ways, individual chemical entities, groups or classes of chemicals or combinations of drugs or chemicals.  A description of the entity should appear in the laboratory's standing operating procedure manual.  This description should include the limitations of the test, such as the drugs included, the limits of quantitation, cut-off for the drugs included, cut-off concentrations (if applicable) or other terms to describe the lowest concentration reliably measured and reported in the specimen.

11.2.3   There may be both qualitative and quantitative results on a report. Qualitative results should be indicated by naming the test followed by positive or none detected.   The term "trace" or a non specific numerical designation (e.g. positive but less than 0.5 mg/L) may be used if a substance was detected in a sample, but the concentration was less than the lowest point on a calibration curve or a designated cut-off.

11.2.4  Quantitative results should be identified using appropriate nomenclature (see #4).  No quantitative value should be reported from a non specific immunological or other initial testing procedure, unless the procedure has been appropriately validated through parallel studies with a reference quantitative method.

11.2.5   Preferred units include mg/L, mcg/L, mg/Kg for fluids and tissues. Other units have been frequently used such as mg/dL, mg%, ng/mL, mcg/mL, mg/100 gm etc.  Such terms may be appropriate, but laboratories should strive for the use of common terms on a national basis. Ethanol should be reported as percent (grams per 100 mLs.) Other commonly accepted units for certain analytes should continue to be used, such as mg/dL for glucose and meq/L for metals.

## 11.3    Preliminary Report

Although generally discouraged, issuing a preliminary report may be required before toxicology testing is complete.  If that is done, only confirmed results should be released, or a clear statement included that the results are unconfirmed and subject to verification.  The report should also include a statement that testing is incomplete, and where appropriate, that subsequent results may affect the final report and its interpretation.

## 11.4    Revised, Supplemental or Addendum Report

After the final report has been issued, it may be necessary to perform additional tests, in which case an addendum or revised report should be issued.  These tests can be added to the existing

report, a revised report may be issued and so identified, or an addendum may be created to provide the results of the additional tests.   Such a report should contain the same identifying information as the original report.

## 11.5    Oral Reports

Occasionally, it may be necessary to provide information on a report to a police or other external agency.  In such situation, the results may be transmitted by telephone subsequent to ensuring that the individual is appropriately identified, that tests are recorded and the results reviewed.

## 11.6    Corrected Reports

After the final report has been issued it may become necessary to correct an error, typographical or otherwise, in the original or supplemental reports.   In this instance the report should be clearly labeled as corrected and contain the same identifying information as the original report(s).

## 11.7    Release of Reports

There should be a procedure in the SOP manual for sending a report to the submitting agency.

## 11.8    Referred Tests

When samples are forwarded to other laboratories for analysis, there should be a record on the final report indicating this fact.  Results of referred tests may be incorporated into the laboratory's final report.

## 11.9    Retention of Records

Records should be retained as long as practical, but for at least 5 years.   Records should include a copy of the report, request and custody forms, work sheets, laboratory data, quality control and proficiency testing records.

There may be state or local regulation governing the time period over which records must be retained.   Laboratory directors are advised to check with the appropriate agencies in their jurisdictions for information.

## 11.10   Litigation Packs

Laboratories are periodically asked to provide a copy of data and documentation related to a particular toxicology report or individual result.  In North America, that is often called a litigation package, and is generally requested by a lawyer for review in a civil or criminal case. It should contain sufficient material to allow independent review by a qualified toxicologist.  The

requesting lawyer or court order may dictate what is included in the package.  However, it will typically include copies of the request for analysis, and chain of custody documents which track the sample from the time of receipt in the laboratory, through analysis and subsequent disposition of the sample(s).  If requested, it may include all analytical data which supports identification, and if applicable, quantitation of the analyte(s). Where appropriate, it should include not just the raw data and reports, but worksheets, sequence tables, quality control data including target ranges. The material in the litigation pack should be complete and properly organized to facilitate review. For larger packs of material, it is helpful to provide a table of contents, and as necessary supplementary explanation.

## 12.    SAFETY

The laboratory should have a safety manual that addresses at a minimum the following issues:

*    specimen handling, including the handling of infectious material and the disposal of biological specimens
*    handling and disposal of solvents, reagents, and other chemicals in the laboratory
*    handling and disposal of any radioactive materials used in the laboratory
*    handling and disposal of laboratory glassware
*    responses to personal injuries and spillage of biological specimens, chemicals, solvents, reagents, or radioactive materials
*    regulation governing dress (e.g. laboratory coats and safety glasses), eating, drinking, or smoking in the laboratory.

Each laboratory must be aware of State and/or Federal Regulations that may exceed minimum standard established on the basis of the above considerations.

**Acknowledgements from 1991 Guidelines**:

*We would not have been able to complete this task so promptly without the generous financial support of the Society of Forensic Toxicologists, Inc. and the Insurance Institute for Highway Safety.*

*The Committee, whose dedication and efforts are gratefully acknowledged, consisted of:*

> *Robert V. Blanke, Ph.D.*
> *Yale H. Caplan, Ph.D.*
> *Leo Dal Cortivo, Ph.D.*
> *Graham R. Jones, Ph.D.*
> *H. Horton McCurdy, Ph.D.*
> *Joseph R. Monforte, Ph.D.*
> *Michael A. Peat, Ph.D.*
> *Alphonse Poklis, Ph.D.*
> *Richard W. Prouty, B.S.*
> *Michael I. Schaffer, Ph.D.*
> *Richard F. Shaw, B.S.*

*The Committee would also like to thank Patricia Thaxter at CompuChem Laboratories-Western Division, for her help in setting up our meetings.*

1997/2002 SOFT/AAFS Laboratory Guidelines Committee:  Graham R. Jones, Ph.D. (Chair), W. Lee Hearn, Ph.D., H. Horton McCurdy, Ph.D. and J. Rod McCutcheon, B.S.

The Guidelines may only be modified by the Laboratory Guidelines Committee of the Society of Forensic Toxicologists and the Toxicology Section of the American Academy of Forensic Sciences as approved by the voting membership of both groups.

The Guidelines have been copyrighted by the Society of Forensic Toxicologists Inc. and by the American Academy of Forensic Sciences, Toxicology Section.

SOFT / AAFS

# FORENSIC TOXICOLOGY LABORATORY GUIDELINES

## DRAFT 2006 VERSION

**Significant changes to 2002 version:**

| | |
|---|---|
| 5.6 | Requirement for a "signature page" in SOP |
| 6.1.7 | Emphasize "universal precautions" for specimen handling |
| 6.3.4 | Delete "immediate" log-in; emphasize storage under appropriate conditions |
| 6.4.1 | Delete example; change liver and brain amount to 50 g |
| 6.4.2 | Add requirement for most drug screens to be completed on 5 mL blood |
| 7.2.1 | Electronic signature or initials acceptable for chain of custody |
| 8.1 | Add new section on screening tests (8.1.1 – 8.1.5) |
| 8.2.2 | Add statement that confirmation of one non-MS finding by another non-MS method not always acceptable |
| 8.2.4 | Encourage use of second GC column (e.g. dual) for confirmation of alcohols |
| 8.2.10 | Paragraph on use of MS "match factors" (caution) |
| 8.2.11 | Paragraph on factors used to compare known and unknown mass spectra |
| 8.2.12 | Additional comments on use of single ion for LC/MS work |
| 8.2.13 | Use of adduct ions as qualifiers not acceptable |
| 8.2.17 | Add paragraph to emphasize "holistic" approach for identifying a drug |
| 8.3.5 | Add statement that in LC/MS an isotopically labelled internal standard can help to compensate for ion suppression |
| 8.5 | New paragraph requiring separation of high concentration drug work from trace work |
| 9.1.9 | Add statement requiring PT samples in suitable matrix |
| 9.1.13 | Monitoring performance of routine assays by calculating %CV |
| 9.2.7 | Delete section; some references out-of-date; readers can easily locate these and better references |
| 9.3.1 | Update name and web address for NIST |
| 9.3.2 | Delete reference to ANST for obtaining CRMs; better sources available |
| 11.8 | Requirement to include identity of reference laboratory on originating lab's report |
| 12.1/12.2 | New section on interpretation |

The Guidelines have been copyrighted
by the Society of Forensic Toxicologists, Inc.
and by the American Academy of Forensic Sciences, Toxicology Section.

## 1.    INTRODUCTION

The *Forensic Toxicology Laboratory Guidelines* were originally published in 1991 as two main documents (*Guidelines* plus *Appendix*), plus the self-evaluation checklist.  The primary document, the *Guidelines*, was initially drafted in response to the growth and regulation of forensic urine drug testing.  It was an attempt to take the important issues that were addressed for *Federal Workplace Drug Testing Programs* and draft them into terms which could be more realistically applied to the areas of *Post-Mortem Forensic Toxicology* and *Human-Performance Forensic Toxicology*.  However, the Guidelines Committee agreed that there were many additional issues which were important to cover, but which might better belong in a supplementary document - the Appendix to the Guidelines.  Since 1991, the profession has matured in many ways.  In 1996 the American Board of Forensic Toxicology launched a Forensic Toxicology Accreditation program based primarily on the SOFT/AAFS Guidelines and Appendix.  In 1997 New York State passed legislation requiring the accreditation of all forensic laboratories in the public sector, and others may follow.  The Guidelines Committee concluded that it was time to redraft the original *Guidelines* and *Appendix* into a single cohesive document which would be easier to reference and to update in the future.  That was done, and the final document approved and adopted.  Subsequent changes to the format and content were made and approved in 1998, 2000 and 2002.

**Introduction from 1991 Guidelines**

*In response to the Guidelines for Federal Workplace Drug Testing Programs issued by the U. S. Department of Health and Human Services in 1987, the Society of Forensic Toxicologists and the Toxicology Section of the American Academy of Forensic Sciences appointed a joint committee of members to recommend a supplementary set of guidelines for the practice of forensic toxicology.  The federal guidelines, especially with respect to laboratory personnel and operating procedures, may not always be appropriate for other types of forensic toxicology, and the guidelines set forth below represent recommendations of the Society/Academy committee in response to that issue. These suggestions do not necessarily reflect opinions about the minimum requirement for any laboratory, and have no regulatory purpose; rather, they are intended to assist laboratories engaged in the practice of forensic toxicology in achieving future goals.*

## 2.    SCOPE

The original committee concluded that specific guidelines for the practice of forensic toxicology would be appropriate for two defined areas: **Post-Mortem Forensic Toxicology** and **Human Performance Forensic Toxicology**.

The committee concluded that it was *not* appropriate to include **Forensic Urine Drug Testing**, because that area of practice has been covered by the Department of Health and Human Services Guidelines and by the College of American Pathologists Accreditation program.

The specific aims of the committee, with respect to postmortem and human-performance

forensic toxicology, were to provide detailed guidelines for laboratory practices and to prepare a checklist for self-evaluation that may also serve as an important component of a program designed to prepare a laboratory for accreditation. The self-evaluation checklist has since been dropped after it was adopted and expanded by the American Board of Forensic Toxicology as part of their laboratory accreditation program in 1996.


## 3.    DEFINITIONS

*Post-Mortem Forensic Toxicology* - determines the absence or presence of drugs and their metabolites, chemicals such as ethanol and other volatile substances, carbon monoxide and other gases, metals, and other toxic chemicals in human fluids and tissues, and evaluates their role as a determinant or contributory factor in the cause and manner of death;

*Human-Performance Forensic Toxicology* - determines the absence or presence of ethanol and other drugs and chemicals in blood, breath or other appropriate specimen(s), and evaluates their role in modifying human performance or behaviour.  (The analysis of ethanol in breath, although important, was not considered by the committee because such tests are not conducted in a laboratory setting); and

*Forensic Urine Drug Testing* - determines the absence or presence of drugs and their metabolites in urine to demonstrate prior use or abuse.

*Standard* -  a reference material possessing one or more properties that are sufficiently well established that it can be used to prepare calibrators.

*Calibrator* - a solution , either prepared from the reference material or purchased,  used to calibrate the assay. Where possible, calibrators should be prepared in a matrix similar to that of the specimens.

*Control* - a solution  either prepared from the reference material (separately from the calibrators; that is, weighed or measured separately), purchased, or obtained from a pool of previously analyzed samples.  Controls from any of these sources are used to determine the validity of the calibration; that is, the stability of a quantitative determination over time.  Where possible, controls should be matrix-matched to specimens and calibrators, as indicated above.

*Reference Material (RM)*  -  a material or substance one or more properties of which are established sufficiently well to be used for calibration of an apparatus, assessing a measurement or assigning values to material.  (AOAC Official Methods of Analysis (1984)).

*Certified Reference Material (CRM)*  - a reference material, one or more of whose properties are certified by a valid procedure, or accompanied by or traceable to a certificate or other documentation which is issued by a certifying body.  (AOAC Official Methods of Analysis (1984)).

## 4.    PERSONNEL

**4.1    Laboratory Director**

4.1.1    The forensic toxicology laboratory should be directed by a person who is qualified by reason of appropriate education and experience to assume the required professional, organizational, educational, managerial and administrative responsibilities.

4.1.2    That education and experience should be comparable to those of persons certified as Diplomates by the American Board of Forensic Toxicology.

4.1.3    Alternative acceptable qualifications include a doctoral degree in one of the natural sciences and at least three years of full-time laboratory experience in forensic toxicology; or a Master's degree in one of the natural sciences and at least five years of full-time laboratory experience in forensic toxicology; or a Bachelor's degree in one of the natural sciences and at least seven years of full-time laboratory experience in forensic toxicology.

4.1.4    The director should also have documented training and/or experience in the forensic applications of analytical toxicology (such as court testimony, research, participation in continuing education programs, and/or peer review of appropriate manuscripts in the field), including a knowledge of evidentiary procedures that apply when toxicological specimens are acquired, processed, and stored and when toxicological data are submitted as part of a legal proceeding.

4.1.5    The laboratory director should be responsible for ensuring that the  laboratory personnel are adequately trained and experienced to conduct the work of the laboratory

4.1.6    The laboratory director should be responsible for maintaining the competency of laboratory personnel by monitoring their work performance and verifying their skills.  This training and experience should be documented.

4.1.7    The laboratory director should be responsible for the development of a complete, up-to-date procedures manual that is available to and followed by all personnel performing tests.

4.1.8    The laboratory director should establish a procedure for validating new analytical methodologies, and for maintaining a quality assurance program to ensure the proper performance and reporting of all test results.

4.1.9    Since forensic toxicology laboratories handle controlled substances and generate results essential to the criminal justice system, the director, to the extent practical or permitted by law, should exert reasonable efforts to ensure that all personnel meet high ethical and moral standards.

## 4.2    Other Laboratory Staff

The range and type of duties of other laboratory personnel will vary according to the size and the scope of the laboratory.  It is recommended that each laboratory should have the following.

4.2.1    A person with the title of deputy director, assistant laboratory director, assistant chief toxicologist, or supervisory toxicologist, who has sufficient training and experience to be familiar with all administrative and testing procedures.  He or she may supervise the work of all analysts, and should be capable of performing full scientific review of all test data, and of acting for the laboratory director in the director's absence.  It is recommended that such individuals should have a minimum of a Bachelors degree in a natural science and 3 years of training in analytical toxicology, at least 1 year of which is in forensic toxicology.

4.2.2    One or more technicians who are capable of performing a variety of test procedures for alcohol, drugs, and other chemicals.  A technician may supervise and review the work of less experienced technicians, and may supervise a section in a larger laboratory.  It is recommended that such individuals should have a minimum of a Bachelor's degree in a natural science, at least 1 year of experience in analytical toxicology and 6 months experience in the present employment.

4.2.3    One or more analysts who are capable of performing tests for one or several analytes, and who are certified in each procedure by the laboratory director.  These analysts may be limited in function to perform specified tasks - for example, an analyst who performs only immunoassays.

## 5.    STANDARD OPERATING PROCEDURES

5.1    The laboratory should have a standard operating procedure manual (SOP) that is complete, up-to-date, and available to all personnel who are performing tests.

5.2    The SOP manual should include detailed descriptions of procedures for sample receiving, accessioning, chain-of-custody, analysis, quality assurance and quality control, review of data, and reporting.

5.3    The SOP manual should include administrative procedures as well as analytical methods and be reviewed, signed, and dated whenever it is first placed into use or changed.

5.4    The SOP manual should include, for each analytical procedure if appropriate, the following:  a) theory and principle of the method, b) instructions for preparation of reagents, c) details of the analytical procedure, d) instructions for preparation of calibrators and controls, e) information about any special requirements for handling reagents or for ensuring safety, f) validation parameters (e.g. LOQ, linearity), g) criteria for the acceptance or rejection of qualitative or quantitative results and h) references.

5.5    When the required documentation is not available for infrequently performed assays, it

should be added as each is performed for the first time.

5.6     The SOP should contain a record of sample signatures and initials of all staff handling specimens and performing analytical work (i.e. a "signature page").  This should be updated as needed to reflect staffing changes.

5.7     The laboratory should maintain out-dated copies of the SOP manual and provide a means for their retrieval from archival storage.


## 6.     SAMPLES AND RECEIVING

### 6.1    Specimen Collection and Labelling

The proper selection, collection, and submission of specimens for toxicological analyses is of paramount importance if analytical results are to be accurate and their subsequent interpretation is to be scientifically sound and therefore useful in the adjudication of forensic cases.  These guidelines can apply equally to investigations by Medical Examiners or Coroners (postmortem forensic toxicology) and to investigation by law-enforcement agencies of drivers suspected of being under the influence of alcohol or other drugs cases involving human performance issues.

6.1.2   The director should develop and provide detailed guidelines and instructions to all agencies or parties the laboratory serves.

6.1.3   Instructions should state the types and minimum amounts of specimens needed to accomplish the requisite analyses and subsequent interpretations.

6.1.4   Whenever possible, the amount of specimen collected should be sufficient to ensure that enough remains for subsequent re-analysis if required.

6.1.5   Instructions should include specific requirements for the type and size of specimen containers and, if appropriate, the type and amount of preservative to be added to biological fluids.

6.1.6   Instructions for labelling individual specimen containers, and acceptable conditions for packing and transportation, should also be provided.

6.1.7   Submitting agencies should be instructed to indicate relevant medical history on how to label clearly all samples from living subjects or decedents who may carry a highly infectious disease such as tuberculosis, hepatitis or Human Immunodeficiency Virus.  However, laboratories should adopt "universal precautions" when handling biological specimens, regardless of reported medical history.

6.1.8   Each specimen should be identified as to type.  For blood, the anatomical site of collection should be stated.  When antemortem and/or perimortem specimens are available from

a decedent, each specimen should be labelled with the time and date of collection.

6.1.9   The name of the subject from whom the specimens were collected should appear on each label together with other appropriate identification; for example, the Medical Examiner's Case Number and/or the subject's Social Security Number.

6.1.10  Where provided, the time and date registered for each specimen should be initialled or signed by a responsible person who performed or witnessed the collection and who assumes responsibility for the chain of custody.

## 6.2    Specimen Handling

6.2.1   A chain-of-custody form should be designed that will accompany specimens from the place of collection to the laboratory.  This document may be incorporated in the laboratory-request form.

6.2.2   Handling and transportation of a specimen from one individual or place to another should always be properly documented.

6.2.3   The chain-of-custody section should be properly completed by responsible personnel at the time the specimens are collected.

6.2.4   Every effort should be made to minimize the number of persons handling a specimen.

6.2.5   Individual specimens should be transported and stored in such a manner as to minimize the possibility of degradation, contamination, tampering and/or damage in shipment.

6.2.6   The condition of the external package should be documented upon receipt at the laboratory, either on the requisition form that accompanies the specimen(s), in the log book, on the external chain-of custody form, or on other documents that constitute normal laboratory records.

6.2.7   Acceptable means of transporting specimens to the laboratory may include hand-delivery, national postal service, or a private or government courier service.

## 6.3    Specimen Receipt

6.3.1   The means of delivery of specimens should be recorded by the receiving laboratory.

6.3.2   Shipping containers should be opened only in a secure area and only by an individual designated to record receipt of specimens.  A "secure area" may be defined as an area to which unauthorized individuals do not have access without escort by authorized personnel.

6.3.3   A hard copy of the specimen-receipt record should be permanently maintained; this record may be computer-generated, typed, or hand-written.

6.3.4    Specimens should be logged-in ~~immediately upon receipt~~ at the earliest opportunity. Pending login, the specimens must be stored under conditions of appropriate environment and security.

6.3.5    The integrity of the individual specimen container should be checked as should the condition of each specimen. Discrepancies should be recorded.

## 6.4        Recommended Amounts of Specimens

6.4.1    Postmortem Forensic Toxicology Specimens: In death investigations, the types and minimum amounts of tissue specimens and fluids needed for toxicological evaluation of the role of drugs and other toxic chemicals are frequently dictated by the analyte or analytes that must be identified and quantitated. ~~For example, in the evaluation of carbon monoxide poisoning, 10 mL of whole blood would be sufficient with adequate specimen volume remaining for re-analysis if required.   On the other hand, to evaluate the role of amitriptyline in a death, 25 gm of liver, 10 mL of heart blood, 5 mL of peripheral blood and the entire gastric contents should be made available.~~

Many deaths involve ingestion of multiple drugs, necessitating larger amounts of tissue and fluids to be collected at autopsy for toxicological examination. The following is a suggested list of specimens and amounts to be collected at autopsy in such cases:

| | |
|---|---|
| Brain | ~~100~~ 50 gm |
| Liver | ~~100~~ 50 gm |
| Kidney | 50 gm |
| Heart Blood | 25 mL |
| Peripheral Blood | 10 mL |
| Vitreous Humor | All Available |
| Bile | All Available |
| Urine | All Available |
| Gastric Contents | All Available |

Unique poisons and situations may dictate the need for other specimens, e.g. lung and intestine. Such cases should be addressed on an individual basis.  However, the amount of specimen routinely collected should be sufficient to allow re-analysis for one or more analytes at a later time, should the need arise.

6.4.2    Human Performance Forensic Toxicology Specimens:   As defined earlier, this activity encompasses the identification and quantitation of ethanol and other drugs and chemicals in blood, breath or other appropriate specimens for evaluation of their role in modifying human performance and behaviour. The analysis of breath ethanol was not considered by this Committee.

Although in many instances the analytes are clearly specified in advance in human performance

forensic toxicology testing, the spectrum of drugs and chemicals may potentially approach those encountered in postmortem toxicology.  Because of this and remembering the difficulties involved in obtaining samples from living persons, it is recommended that a minimum of 15 mL of blood be collected for toxicological analysis.  ==However, because the volume of blood received for human performance testing and some postmortem work is often limited, forensic toxicology laboratories should develop their analytical methods such that a reasonable complete drug screen can be completed on no more than 5 mL.==

Urine may also be submitted for testing; a minimum volume of 30 mL is recommended. It must be emphasized that neither qualitative nor quantitative analysis of urine permits an evaluation of the effect of the drug or chemical on human behaviour. If other specimens are submitted and analyzed, any conclusions regarding drug use or effects on human behavior should be based only on appropriate validated scientific studies.


## 7.    SECURITY AND CHAIN-OF-CUSTODY

### 7.1    The Laboratory

7.1.1    Access to the forensic toxicology laboratory should be limited. The laboratory director should authorize and document the personnel able to enter designated areas.

7.1.2    Unauthorized personnel should be escorted and may be required to sign a log-book upon entry and departure from the laboratory, recording the time, date and purpose of the visit.

7.1.3    The physical layout of the laboratory must be such that unauthorized personnel cannot enter without detection.

### 7.2    Specimens

7.2.1    Receipt ~~of specimens~~ should be indicated by ==handwritten or electronic== signature ==(or initials)== of individuals receiving the specimens; at a minimum the date of receipt ~~and time~~ ==should also be== included.

7.2.2    Specimens received should be labeled with the name of the decedent or suspect, case number, specimen type (e.g. blood) or unique identifier, date specimen taken and identification of the individual taking the sample.

7.2.3    Specimens must be stored in a secure manner.

7.2.4    For the maintenance of specimen security it is recommended that, where possible, the laboratory have a separate accessioning area.  In this area, specimens are received, assigned accession numbers, aliquots removed and/or stored in refrigerator/freezers.

7.2.5    Any transfer of specimens, or portions thereof that are removed for analysis, must be

documented as part of the permanent laboratory record.

7.2.6    It is recommended that the chain of custody documentation reflect not only the receipt of the specimen from an outside source, but also transfers of the specimen or an aliquot thereof, within the laboratory. If multiple specimens are involved, a batch form may be used.

7.2.7    An aliquot or a batch of aliquots chain of custody may be used for indicating the transfer of portions of specimens for testing.  This form should indicate the date, the test for which the aliquot was taken, the laboratory accession numbers, the identity of the individual obtaining the aliquots and the identity of the individual to whom the aliquots were given, if applicable.

7.2.8    Specimens may be transferred to a secure long-term refrigerator/freezer after analysis. Transfers between storage areas and/or subsequent disposal should be documented. The laboratory should develop a standard operating procedure for retention and disposal of specimens. This procedure should reflect local, state, or federal regulations.

7.2.9    The laboratory should maintain a written policy and instructions pertaining to retention, release and disposal of specimens.


8.    **ANALYTICAL PROCEDURES**

**8.1    Screening Tests**

8.1.1    In most instances where a laboratory is asked to look for drugs in biological specimens, screening tests are employed.  Screening tests may be directed towards a class of drugs, such as opiates, or may be a broad-based screen such as GC/MS.

8.1.2    Screening tests must be appropriate and validated for the type of biological specimens being analyzed.  For example immunoassays used on whole blood must be appropriately validated for that purpose.  If a reporting cut-off is used, the precision of the assay around that cut-off must be demonstrated.  Specimens spiked at the cut-off concentration must be clearly distinguishable from specimens that do not contain the target analyte.

8.1.3    If the results of preliminary, unconfirmed screening tests are included on the final report, the report must clearly state that the results are unconfirmed.

8.1.4    Where the results of class-based screening tests are normally included on the final report (e.g. immunoassay test for opiates, benzodiazepines, amphetamines), it is good practice to inform the client of the drugs normally detected by that test and the approximate sensitivity.  For example, a "negative" result for some manufacturers immunoassay tests may not mean that lorazepam was absent, due to poor cross reactivity.

8.1.5    It is good practice to segregate the analysis of biological fluids from other exhibits suspected of containing drugs (e.g. spoons, syringes).  If physical separation of the analytical

areas is not practical, such as using different rooms, every effort should be made to use separate glassware and pipettes.  If use of different analytical instruments is not practical (e.g. dedicated GC/MS), lack of residual contamination and carry over must be demonstrated after the high concentration exhibits have been analyzed.

## 8.2    Confirmatory Tests

8.2.1    As a general matter of scientific and forensic principle, the detection or initial identification of drugs and other toxins should be confirmed whenever possible by a second technique based on a different chemical principle.

8.2.2    Where possible, the confirmatory (second) test should be more specific ~~and sensitive~~ than the first test for the target analyte.  The use of mass spectrometry is recommended as the confirmatory technique, where possible and practical.  For example, detection of an analyte by immunoassay and 'confirmation' by GC/NP or GC/FID does not generally provide sufficient specificity for prosecution of a criminal case.  However, the rigorousness required of a confirmation depends to some extent on the importance of the analytical finding and circumstances of the case.

8.2.3    In some circumstances, confirmation using the same system as the first might be acceptable if chemical derivatization (e.g. silylation or acylation) is used to change the retention times.  However, confirmation using a second GC system with a similar though not identical column, is not usually acceptable since the retention indices of many analytes may not differ substantially from one system to the other (e.g. DB-1 and DB-17).

8.2.4    For ethanol, although false positives are unlikely, confirmation using a second analytical system is encouraged.  One approach is to confirm detection of ethanol by GC using an enzymatic assay.  Alternatively, confirmation using a second GC column is acceptable IF the second results in significant changes in retention time AND change in elution order of at least some of the common volatiles (e.g. ethanol, isopropanol, acetone).  The second analysis should be performed on a separate aliquot of the specimen, or an alternate specimen from the same case.

8.2.5    Use of a second immunoassay system (e.g. RIA) to confirm another immunoassay (e.g. FPIA) is not regarded as acceptable, even though the assays differ somewhat in principle.  The rationale for this is that the analytes that cross-react with one assay are also likely to cross-react in the second assay because the antibodies may be raised to the same drug or closely related substance.

8.2.6    A second immunoassay with different cross-reactivity may sometimes be used to augment the initial screen (for example a broadly cross-reacting opiate immunoassay, followed by a second immunoassay with more specific cross-reactivity to unconjugated morphine).  These results would normally still require confirmation with a more specific method (e.g. GC/MS).

8.2.7    It is a good practice to confirm the identity of an analyte in a different extract of the same specimen from that used for the first test, or in a second specimen.  However, confirmation of a

drug or toxin in the same original extract of a single specimen would not normally be regarded as acceptable, since that would not rule out the possibility that the extract became contaminated during the extraction or that the wrong sample was tested.

8.2.8   The quantitation of an analyte may serve as acceptable confirmation of its identity if it was initially detected by a significantly different method (e.g. GC/MS SIM quantitation of a drug detected by immunoassay).

8.2.9   Where mass spectrometry is used in selected ion monitoring mode for the identification of an analyte, whether as part of a quantitative procedure or not, the use of at least one qualifying ion for each analyte and internal standard, in addition to a primary ion for each, is strongly encouraged where possible.  Commonly used acceptance criteria for ion ratios is ±20% relative to that of the corresponding control or calibrator.  However, it is recognized that some ion ratios are concentration dependent and that comparison to a calibrator or control of similar concentration may be necessary, rather than an average for the entire calibration.  Ion ratios for LC/MS assays may be more concentration and time dependent than for GC/MS and therefore acceptable ion ratio ranges of up to ±25% or 30% may be appropriate.

8.2.10  In routine practice, interpretation of GC/MS-EI full scan mass spectra is performed by the instrument's software as a semi-automated search against a commercial or user-compiled library. The quality of the match or "fit" may be aided by the factor that is generated, either as a ratio or percentage, where 1.0 or 100% are "perfect" matches.  However, such "match factors" must be used as guides only and are not sufficiently reliable to be used as the final determinant of identification.  Final review of a "library match" must be performed by a toxicologist with considerable experience in interpreting mass spectra; experience and critical judgement are essential.  Interpretation, at a minimum, should be based on the following principles:

For a match to be considered "positive", all of the major and diagnostic ions present in the known (reference) spectrum must be present in the "unknown".  Occasionally, ions that are in the reference spectra may be missing from the "unknown" due to the low overall abundance of the mass spectrum.  If additional major ions are present in the "unknown" it is good practice to try to determine if the "extra" ions are from a co-eluting substance or "background" such as column bleed or diffusion pump oil.  Examination of reconstructed ion chromatograms of the suspected co-eluting substance relative to major ions from the reference spectrum will help to determine this.

8.2.112      GC/MS chemical ionization and LC/MS mass spectra are often simpler than GC/MS EI spectra and therefore afford fewer options for the choice of qualifier ions.  However, it is often possible to adjust the ionization energy (e.g. cone or fragmentor voltage with a single quadrupole LC/MS) in order to produce additional or stronger secondary ions.  Running the sample under conditions of both weak ionization (to maximize the quantitation ion signal) and stronger ionization (to promote fragmentation and facilitate confirmation of identity) is an option. In some circumstances, monitoring a single ion of an analyte may be appropriate, depending on the uniqueness of the ion and whether the analyte has also been characterized by other methods.

8.2.12̶3̶     The use of isotope or adduct ions as qualifier ions for identification is not valid.     |

8.2.13̶4̶     It is recommended that at least the presence of a drug or toxin be verified in more     |
than one specimen, or if only one specimen is available by replicate analyses on different
occasions and with adequate positive and negative controls in the same matrix. However, it is
acknowledged that an analyte will not necessarily be present in all specimen types.

8.2.14̶5̶     Use of a second confirmatory technique is encouraged for all analytes, including     |
ethanol (e.g. GC, ADH, or colorimetric) and carbon monoxide (e.g. visible spectrophotometry,
palladium chloride or GC).

8.2.15̶6̶     It is recognized that in some circumstances a suitable second test procedure is not     |
available and the probability that the first test is incorrect is almost zero.  For example, the
probability that a 75% carboxyhemoglobin in a well-documented suicide is incorrect, when
obtained by a properly conducted spectrophotometric assay, is exceedingly low. However, the
unexpected finding of a 30% carboxyhemoglobin from a motor vehicle accident victim by a
similar determination in blood holds a lower degree of certainty.

8.2.16̶7̶     In practice, the extent and nature of methods used to "confirm" the presence of a     |
particular analyte will depend in part on the type of case and nature of the analyte.  A "holistic"
approach is required.  For example, in a well documented suicide where a note is found with an
empty container of digoxin that was prescribed to that person, an appropriately validated RIA for
digoxin may be all that is required.  However a digoxin related death where there was no
suspicion of suicide and where the medication was not prescribed to that individual may require
much more extensive testing, including LC/MS.

## 8.3     Method Calibration and Validation

8.3.1   When conducting analyses, laboratories may group specimens into batches.  Each batch
should contain a sufficient number of calibrators and controls, the total number of which will
depend on the size of the batch and the nature of the tests.

8.3.2   When analyses are being performed on unusual specimens (decomposed tissue, vitreous
fluid, etc.), appropriate matrix-matched calibrators should, when possible, be prepared and tested
concurrently with the specimens.

8.3.3   For immunoassays, a laboratory should, at a minimum, be able to demonstrate that the
blank or negative calibrator plus two standard deviations does not overlap with the cut-off or the
lowest positive calibrator.  Alternatively, the laboratory may determine the limit of detection
(LOD) by determining the mean value for the blank and adding three standard deviations to this
value (LOD = Xm + 3SD).   However, it should be noted that for other assays (e.g. GC, HPLC)
the true LOD may be higher than indicated by this formula if significant adsorption or other
losses occur.  For example, in chromatographic assays, the LOQ might be the smallest blood
concentration of a drug needed to give a peak height three times the noise level of the

background signal from a blank blood sample. Alternatively, for infrequently performed assays where the analyte measured is always within the calibration range of the assay and well above the LOD, it may be sufficient to indicate that the detection limit is "less than" a certain value. Thus the true LOD may be derived experimentally, but should not be less than the blank plus three standard deviations. The limit of quantitation (LOQ) may be derived by adding ten standard deviations to the true value of the blank. However, it is preferable to determine the LOQ experimentally as the lowest concentration for which an acceptable coefficient of variation can be routinely achieved.

8.3.4   For chromatographic assays, the LOD and LOQ may be administratively defined in terms of the concentration of the lowest calibrator, and therefore may not need to be determined experimentally. However, if results are reported below the value of the lowest calibrator, LOD and LOQ should be determined.

8.3.5   The use of a suitable internal standard for all chromatographic assays (e.g. GC, HPLC, GC/MS) is recommended. The internal standard should have chemical and physical properties as similar to the analyte as possible. If the analyte is to be derivatized, an internal standard should be chosen which will form an analogous derivative. Stable isotope (e.g. deuterated) standards are recommended for GC/MS and LC/MS assays, although well chosen non-deuterated internal standards may occasionally give equivalent or better performance. In LC/MS, however, the use of isotopically-labeled internal standards may be the only way to compensate for ion suppression. The internal standard should be added to the sample at the earliest possible stage in the method, and in any event before buffering and extraction of the sample. Markers that are added after the initial extraction are regarded as "external standards" and are discouraged.

8.3.6   Linearity of the procedure should be established by typically using at least three calibrators. The concentration of the calibrators should be such that they bracket the anticipated concentration of the specimen(s). If the concentration of the specimen exceeds the concentration of the highest calibrator, the specimen should be diluted and re-extracted if accurate quantitation is required. Otherwise the specimen should be reported as having a concentration greater than the highest calibrator. If the concentration of the specimen should be less than that of the lowest calibrator, an additional calibrator should be set up which falls below the expected range of the analyte in the sample. Alternatively, the volume of the specimen may be doubled and re-extracted if it can be demonstrated that the assay is not matrix dependent. If an accurate quantitation is not necessary, then the specimen can be reported as containing the analyte at less than the lowest calibrator (as an alternative to the term "trace amount"). Use of the term "trace amount" implies that the substance is either present at a concentration above the LOD for the assay, and/or has been confirmed to be present by another method. It is acknowledged that some assays are inherently non-linear and that the use of quadratic or other mathematical models may be necessary

8.3.7   Criteria for acceptance of a chromatographic calibration should be stated in the method. For a multi-point calibration this factor is usually the correlation coefficient. For most applications, an acceptable correlation coefficient is 0.99. However, there may be circumstances where a correlation coefficient of 0.98 is minimally acceptable. In addition, it is good practice to

evaluate the range of the calibration by calculating the value of each calibrator against the curve. Values of ±20% are generally acceptable for most applications, although ±10% are preferred for analytes such as ethanol. Single point calibrations are discouraged unless controls are used at or close to the upper and lower quantitative reporting limits.

8.3.8   For specimens having concentrations significantly higher than the highest calibrator, the laboratory should exercise precautions so that carry-over of analyte into the next specimen does not occur. Similarly, specimens with very low concentrations should be checked to ensure that carry-over from a previous very high positive has not occurred.

8.3.9   It is recognized that for a variety of reasons occasional analytical results will be outliers; that is, analytical values which deviate significantly and spuriously from the true value. "Outlier" results of control, blanks or calibrators should be obvious. However "outlier" results of case specimens may not be identified if only run singly, unless that result can be compared with one from a separate analytical determination. For this reason replicate extraction and quantitative analysis, at least in duplicate, is recommended. The laboratory should determine the acceptable criteria for replicate analysis. A maximum deviation of ±20% of the mean is recommended.

8.3.10  Retention time should be part of the acceptance criteria for chromatographic assays. For GC based assays, deviations of 1 - 2% from the calibrators or controls may be acceptable. Slightly larger deviations may be acceptable for HPLC based assays, particularly where the mobile phase is being programmed non-isocratically.

## 8.4      Method of Standard Additions

It is recognized that the matrix of some forensic specimens may be "unique" in some way (e.g. putrefied or embalmed) such that it is difficult or impossible to obtain a similar matrix for the preparation of reliable calibrators and controls. In these circumstances, the use of a "standard addition" procedure may be preferable to a conventionally calibrated assay. In the method of "standard addition" known amounts of analytes are added to specimen aliquots and quantitation performed by comparing the proportional response of the fortified aliquots with that of the unknown specimen. Use of an internal standard and a multiple point calibration is strongly recommended to check for matrix effects.

## 8.5      Separation of Tests Involving High Drug Concentration

Care should be taken to avoid cross contamination of exhibits due to extreme differences in the concentrations of analytes. Generally, routine analysis of solid dose exhibits should be conducted in a separate laboratory from that used for analysis of biological exhibits. However, occasionally, forensic toxicology laboratories are required to analyze powdered or pharmaceutical exhibits, or other exhibits containing high concentrations of drugs such as spoons and syringes. Where such analyses are undertaken in the same laboratory, care should be taken to separate these tests from that of biological samples (for example, by use of separate glassware,

==and if possible analytical equipment). At a minimum there should be adequate pre-dilution of the substance being tested and for chromatography-based tests, liberal use of solvent "blanks" to demonstrate lack of carryover.==

## 9.    QUALITY ASSURANCE AND QUALITY CONTROL

### 9.1    Quality Assurance

9.1.1    Quality assurance encompasses all aspects of the analytical process, from specimen collection and reception through analysis, data review and reporting of results. It includes, but should not be limited to, quality control of each analysis and proficiency testing of the laboratory.

9.1.2    Quality assurance assumes a unique role in the forensic science disciplines because results are subject to challenge in the "adversarial" justice system. One purpose of a quality assurance program is to detect error, whether random or systematic, and to initiate appropriate remedial action.

9.1.3    Standards used should be appropriate for the test being performed, and documentation should be maintained describing their sources and dates of acquisition. Reference material should be stored so as to ensure its stability and integrity. If a standard is prepared in the laboratory, the source(s) of the chemical reagent(s), the method of preparation, and verification of the final product should be recorded and maintained on file.

9.1.4    Where practical, the identity and purity of reference materials should be verified by the laboratory.

9.1.5    Labelling should be uniform for all standards and reagents. Date of acquisition or preparation, and the initials of the preparer, should be included on the label. The expiration date should always appear on the label ==of liquid reagents==. An expiration date furnished by a vendor/manufacturer determines the useful lifetime of the standard/control unless it can be verified beyond that date

9.1.6    Initially, a sufficient number of calibrators should be run to determine the characteristics of the calibration curve; a blank and at least three calibration points are recommended for the initial calibration process. The stability of the calibration curve should be tested under laboratory conditions by the addition of controls, both positive and negative.

9.1.7    Controls are not analyzed for calibration purposes. As a general rule an adequate set of controls should include, at a minimum, a specimen that does not contain the analyte (defined as a negative control) and a specimen containing the analyte at a concentration that realistically monitors the performance of the assay. Additional controls can be used to test the linearity of the calibration over the desired range.

9.1.8    The SOP manual should specify corrective action to be taken when control results are outside acceptable limits.  Under optimal conditions a laboratory should have a quality control supervisor, but having a staff member dedicated to quality control may be impractical for small laboratories.

9.1.9    Forensic toxicology laboratories should participate in an external proficiency testing program which includes, at a minimum, samples for alcohol in blood or serum, and for drugs in at least one type of specimen, representative of that typically analyzed by the laboratory (e.g. whole blood or serum for a postmortem toxicology laboratory).  The program should realistically monitor the laboratory's quantitative capability.

9.1.10   The laboratory director should regularly review results of quality control and proficiency testing.  Signing and dating the record constitutes appropriate evidence of review.  It is important that bench personnel be informed of quality control and proficiency test results. Attention should be given to procedures for monitoring potential sources of error.  Proficiency test materials should be retained until the summary report is received and any corrective action satisfactorily completed.

9.1.11   Appropriate and timely corrective action in the event of proficiency test errors is essential.  False positive errors are the most serious and possible causes of the error must be thoroughly investigated, including contamination of glassware and carry-over.  A false negative result can be defined as failure to detect a substance which the laboratory claims to be able to detect, or that should have been detected by the method.  By this definition, a false negative indicates a failure that should be investigated expeditiously.  A false negative can also occur because the routine methods of the laboratory will not detect the analyte at all, or at the spiked concentration.  In this instance the laboratory director should decide whether the analytical procedures need revising, or whether the failure to detect that analyte at the spiked concentration is acceptable (e.g. the concentration is below that of toxicological interest).  All corrective action should be documented.

9.1.12   Quantitative proficiency test errors should also be investigated.  Usually, the target concentrations of analytes are expressed in terms of the mean value for all participants in the survey, plus or minus 1 SD or 2 SD.  Occasionally, the weighed-in target may be disclosed. Where the magnitude of an error is large, the need for corrective action is obvious and the underlying cause may be easy to determine.  For some analytes, especially those infrequently quantitated, 2 SD, a common measure of acceptability, may represent an unacceptably large percentage deviation from the mean.  Therefore, a realistic percentage deviation should be used, such as ±20% or ±30%.  Depending on the magnitude of the error, corrective action may be as simple as review of the assay results to ensure that the calibration was valid, that the assay was in control, and that any transcriptions were accurate.  For more serious errors, corrective action may require repeating the analysis, re-validation of the assay, or even redevelopment of the test. All corrective action should be documented.

9.1.13   It is good practice to monitor the performance of assays by periodically calculating the coefficient of variation (e.g. % C.V. of controls). For chromatographic assays, coefficients of

variation greater than about 15% indicate relatively poor precision and further investigation of assay performance, including troubleshooting or further development.

9.1.14  Routine maintenance of equipment is an important part of any quality assurance program. It is a good practice to document all routine and non-routine maintenance, including tasks such as changing septa and liners on GCs.  Documentation may be in a logbook, which can be kept by larger equipment, or check-sheets filed in a ring binder.  Multiple items of similar equipment (e.g. pipettors) should be labelled in order to readily differentiate them.

## 9.2    Quality Control

9.2.1   Control Materials:   In the true sense, a control is a test sample, identical to the unknown, but containing the analyte at a known concentration.  With each batch of specimens, whether a single specimen or multiple ones, controls would be carried through the procedure in parallel with the unknowns.   It is suggested that each batch of specimens include at least 10% controls. The controls must include one positive and one negative control.  For qualitative assays positive and negative controls, acceptable results may simply be positive or negative, respectively.   For quantitative assays, negative controls should give results that indicate the analyte is absent, or below the LOD for the assay.  An acceptable positive control result of ±20% is recommended for most drugs, except for controls that are at or close to the LOQ of the assay, when ±25-30% may be more realistic.  The control must give a result within a predetermined deviation from its mean value, or the test is deemed "out of control" and therefore, the result generated from the unknown specimen is unacceptable.

9.2.2   It is a common and accepted practice in clinical laboratory work to obtain or prepare material and then establish the target range by replicate analysis of the control in parallel with existing QC material.  For example, control material may be prepared by pooling specimens from multiple cases.  While that approach is still accepted in forensic toxicology, it is scientifically less desirable than preparing or purchasing control material with a specific weighed-in target concentration, which will allow independent verification of calibration accuracy.  If control target ranges are experimentally determined, it is important for that range to be verified against control material, prepared commercially or independently in-house, prior to it being put into routine use.

9.2.3   For some forensic toxicology procedures, providing a true control is no more difficult than any other test.  For others, however, in which the matrix may be unique (e.g. decomposed tissues, bone, hair or nails), providing a control is not only difficult, but can never approach the ideal of being identical to the unknown specimen.  Controls should be prepared from standard material from a different source than that used in calibration of the assay.  Where this is not practical, the control should at least be prepared using a different weighing or dilution than that used to prepare the calibrators. Control material prepared from the same solution used to prepare the calibrators is unacceptable, since any errors made in preparation of the standard solution will not be detected.

9.2.4   Open Controls:   Open controls are those whose identity and expected result are known to

the analyst. They can be purchased from commercial vendors, prepared in the laboratory, distributed by professional organizations or saved and pooled from former cases.  Regardless of the source, the concentration of the analyte in the control must be validated.

For tissue specimens or other unusual matrices, more innovative approaches may be necessary. Fortifying drug-free matrices, such as tissue homogenates, out-dated blood bank blood, plasma to simulate the unknown specimen is acceptable.   A "blank" or negative control may, of course, be the unfortified matrix.

9.2.5   Results from quantitative quality control material should be recorded in a manner that readily permits the detection of trends such as the deterioration of reagents, calibrators or controls.  For frequently run controls, results may be plotted in a graphical manner such as a Levy-Jennings plot.  For less frequently run material, tabulation is acceptable.  Determination of the coefficient of variation for the controls may give useful information about the precision of the assay, and may indicate which assays need further development.

9.2.6   <u>Blind Controls</u>:   As the name implies, these are identical to open controls except their identity is unknown to the analyst.  It is generally recognized that this is the ideal way to maintain quality control.  A blind control should test the entire laboratory process including receiving, accessioning, analysis and reporting.   This can be accomplished by setting up a "dummy account" or by co-operation with the submitting agency.  Such blind controls are sometimes called "double blinds".  A more practical approach is to have the accessioning section insert blind controls into each batch of specimens.  However, either of these processes can be difficult to accomplish in a small laboratory; they are both costly and time consuming.

9.2.7   Sources of Information:   There are many good references relating to the general topic of quality control as well as to specific application relating to analytical procedures.  These include: *Tietz Textbook of Clinical Chemistry*, 3rd edition, by Carl A. Burtis, Edward R. Ashwood, Norbert W. Tietz, Adrianne Williams (Editors), W.B. Saunders Co., Philadelphia, 1998; *Cost-Effective Quality Control: Managing the Quality and Productivity of Analytical Processes*, by James O. Westgard and Patricia L. Barry, AACC Press, Washington DC, 1986; *Quality Assurance in Postmortem Toxicology* by Wilmo Andollo, Chapter 12.5 in *Handbook on Drug Abuse*, Steven Karch senior editor, W. Lee Hearn section editor, CRC, Boca Raton, FL, 1998, pp 953-969.

## 9.3    Reference Materials

9.3.1   The National Institute of Standards and Technology (NIST; http://www.nist.gov), formerly the National Bureau of Standards (NBS), refers to these as Standard Reference Material (SRM).  For example, a specific RM may have a melting point of such sharpness and reproducibility that it can be offered as an RM for the calibration of a thermometer in a melting point apparatus.  However, it may not be appropriate for preparing a calibration curve.  A certified reference material (CRM), or SRM, suitable for the preparation of a standard to which calibration material can be compared, must be certified by a method generally recognized by the scientific community as one that

validates the CRM for this purpose. The nature of the procedure depends, of course, on the properties of the analyte.

9.3.2   Several different organizations supply CRMs of a variety of types. A complete listing of organizations supplying CRMs is available from the International organization for Standardization, American National Standards Institute, 1430 Broadway, New York, NY 10018. Catalogs or literature describing CRMs are available from individual organizations, such as the NIST.

9.3.2   It is important to remember that most RMs are not 100% pure.  The label or package insert should indicate the purity or the nature of the contaminants or the degree of water of hydration.  Further instructions may provide guidance as to how the RM is to be used.  For example, perhaps it must be protected from light, or stored at a low temperature or protected from moisture.  These instructions must be carefully followed in order to use the RM according to its specifications.

9.3.3   Many toxicants, including drugs, ~~Drugs, perhaps more than many other chemicals,~~ may have limited shelf-lives.   Degradation due to photo-reactions, oxidation in the air or by other means, requires that periodic assessment of these changes must be monitored.  Methods for detecting such changes are varied but even RMs may not retain their original purity.  RMs supplied in solution may have more limited stability than those supplied as pure, dry, solids.

9.3.3   The importance of acquiring pure chemicals used as standards and periodically monitoring their purity, requires the development and implementation of procedures which are part of the standard operating procedure of the laboratory.   The steps which can be used are summarized as follows:

    1)    maintain instruments and all measuring devices at optimal performance with regular calibration checks.
    2)    acquire chemicals to be used as standards from reliable sources who validate the stated purity, preferably by a certifiable trace to a CRM or SRM, or
    3)    acquire chemicals as RM, carefully following any instructions accompanying the RM for maintaining anhydrous conditions or to avoid deterioration, or
    4)    acquire chemicals from other sources but always assess the purity of the material by appropriate measurement of physical constants and/or instrumental methods.
    5)    regardless of the source of the chemical for preparation of the standard, devise a means by which the standard can be monitored periodically in order to detect any deviation from its original purity.
    6)    before using a newly prepared standard, compare its properties with a previously validated standard or with a CRM or SRM.

## 9.4   Metabolites

9.4.1   Many testing procedures, particularly immunoassay tests, are targeted to detect drug metabolites.  As might be expected, these are more difficult to obtain in pure form, free of

interferences and certified as to their authenticity.   A number of commercial sources offer drugs and some metabolites, together with deuterated forms useful as internal standards in GC/MS and LC/MS. Frequently the commercial sources will supply a statement of purity with the material. This is not the same as a CRM or SRM, but after verification of purity, may be quite acceptable.

9.4.2   Metabolites of pharmaceutical drugs can, at times, be obtained from the company that manufactures them.  This often requires a personal contact with an appropriate official of the company, completion of necessary paperwork and some time delay.   The *Physicians' Desk Reference* in its "Manufacturers' Index" lists names and telephone numbers of contact officials.

9.4.3   When the identity of the metabolite has been described in a reputable scientific journal, but no source is evident, a search of catalogs from suppliers of organic chemicals may be fruitful. If this is not successful, then it may be necessary to synthesize the metabolite.  In this case its identity should be confirmed by standard, acceptable methods.  In all of these alternatives, purity must be assessed.

## 10.    REVIEW OF DATA

10.1   Before results are reported, each batch of analytical data should be reviewed by scientific personnel who are experienced with the analytical protocols used in the laboratory.  At a minimum this review should include:

    *    chain-of-custody documentation
    *    validity of analytical data (e.g., shape and signal-to-noise ratio of
         chromatographic peak) and calculations
    *    quality control data.

10.2   Where possible, the results should be reviewed in the context of the case history, autopsy findings and any relevant clinical data.  The review should be documented within the analytical case record.

## 11.    REPORTING OF RESULTS

### 11.1    General Recommendations

11.1.1  Many, if not most, forensic toxicology laboratories are an integral part of state or local government supported, medico-legal investigative agencies, or are associated with them.  Each laboratory must follow the mandates of the particular agency and/or governmental sub-division when reporting results.  Thus, while it is neither possible nor desirable to suggest a uniform format for reports, they should include all information necessary to identify the case and its source, and should bear test results and the signature of the individual responsible for its contents.

11.1.2  The following recommendations are made:

1)  name and/or identification number
2)  laboratory identification number
3)  name of submitting agency or individual
4)  submitting agency
5)  date submitted
6)  date of report
7)  specimens tested
8)  test results
9)  signature of approving individual

11.1.3  Although most forensic toxicology reports are confidential and often sensitive in content, some jurisdictions may treat the report as an official public document.  If the results are confidential, every precaution should be exercised to ensure that a properly authorized person receives the information when it is transmitted by telephone, computer, FAX, or any other method different from conventional delivery of a written report.  Each laboratory should formulate its own policy for retention or release of information and for response to requests for its documentation.

## 11.2    Terminology in Reports

11.2.1  "Positive" indicates that a particular substance has been identified in accordance with the laboratory protocols. "Negative", "Not Detected", or "None Detected" has been generally used to indicate the absence of an analyte or analytes.  "None detected" is preferable.  This indicates that particular substances were absent within the limitations of the test(s) performed.

11.2.2   Tests may be described in a number of ways, individual chemical entities, groups or classes of chemicals or combinations of drugs or chemicals.  A description of the entity should appear in the laboratory's standing operating procedure manual.  This description should include the limitations of the test, such as the substances ~~drugs~~ included, the limits of quantitation, cut-off for the substances ~~drugs~~ included, cut-off concentrations (if applicable) or other terms to describe the lowest concentration reliably measured and reported in the specimen.

11.2.3   There may be both qualitative and quantitative results on a report. Qualitative results should be indicated by naming the test followed by positive or none detected.   The term "trace" or a non specific numerical designation (e.g. positive but less than 0.5 mg/L) may be used if a substance was detected in a sample, but the concentration was less than the lowest point on a calibration curve or a designated cut-off.

11.2.4  Quantitative results should be identified using appropriate nomenclature ~~(see #4)~~.  No quantitative value should be reported from a non-specific immunological or other initial testing procedure, unless the procedure has been appropriately validated through parallel studies with a reference quantitative method.

11.2.5   Preferred units include mg/L, mcg/L, mg/Kg for fluids and tissues. Other units have been frequently used such as mg/dL, mg%, ng/mL, mcg/mL, mg/100 gm etc.  Such terms may be appropriate, but laboratories should strive for the use of common terms on a national basis. Ethanol should be reported as percent (grams per 100 mL.) Other commonly accepted units for certain analytes should continue to be used, such as mg/dL for glucose.

## 11.3   **Preliminary Report**

Although generally discouraged, issuing a preliminary report may be required before toxicology testing is complete.  If that is done, only confirmed results should be released, or a clear statement included that the results are unconfirmed and subject to verification.  The report should also include a statement that testing is incomplete, and where appropriate, that subsequent results may affect the final report and its interpretation.

## 11.4   **Revised, Supplemental or Addendum Report**

After the final report has been issued, it may be necessary to perform additional tests, in which case an addendum or revised report should be issued.  These tests can be added to the existing report, a revised report may be issued and so identified, or an addendum may be created to provide the results of the additional tests.   Such a report should contain the same identifying information as the original report.

## 11.5   **Oral Reports**

Occasionally, it may be necessary to provide information on a report orally to a police or other external agency.  In such a situation, the results may be transmitted by telephone subsequent to ensuring that the individual is appropriately identified, that tests are recorded and the results reviewed.

## 11.6   **Corrected Reports**

After the final report has been issued it may become necessary to correct an error, typographical or otherwise, in the original or supplemental reports.   In this instance the report should be clearly labeled as corrected and contain the same identifying information as the original report(s).

## 11.7   **Release of Reports**

There should be a procedure in the SOP manual for sending a report to the submitting agency.

## 11.8   **Referred Tests**

When samples are forwarded to another laboratory other laboratories for analysis, there should

be a record on the final report indicating this fact.  Results of referred tests may be incorporated into the originating laboratory's final report, but the name of the laboratory that actually performed the test should be stated.


## 11.9    Retention of Records

Records should be retained as long as practical, but for at least 5 years.   Records should include a copy of the report, request and custody forms, work sheets, laboratory data, quality control and proficiency testing records.

Laboratories are strongly encouraged to archive electronic data files for a similar period as the paper records, by backup to suitable media such as CD or DVD disk.  This is particularly important for full scan screening data, where because of the nature of the data it is impractical to keep a complete paper copy.

There may be state or local regulation governing the time period over which records must be retained.   Laboratory directors are advised to check with the appropriate agencies in their jurisdictions for information.

## 11.10   Litigation Packs

Laboratories are periodically asked to provide a copy of data and documentation related to a particular toxicology report or individual result.  In North America, that is often called a litigation package, and is generally requested by a lawyer for review in a civil or criminal case. It should contain sufficient material to allow independent review by a qualified toxicologist.  The requesting lawyer or court order may dictate what is included in the package.  However, it will typically include copies of the request for analysis, and chain of custody documents which track the sample from the time of receipt in the laboratory, through analysis and subsequent disposition of the sample(s).  If requested, it may include all analytical data which supports identification, and if applicable, quantitation of the analyte(s). Where appropriate, it should include not just the raw data and reports, but worksheets, sequence tables, quality control data including target ranges. The material in the litigation pack should be complete and properly organized to facilitate review. For larger packs of material, it is helpful to provide a table of contents, and as necessary supplementary explanation.

## 12.  INTERPRETATION OF TOXICOLOGY RESULTS

## 12.1    General Considerations

Forensic toxicologists are discouraged from including interpretive comments on toxicology reports unless the specific jurisdiction or client requires it AND the toxicologist has access to adequate information about the case, such as the circumstances of the case death or incident, and as appropriate the medical history and autopsy findings.  Interpretation generally requires a "holistic" approach where as much relevant information as practical is considered in formulating

an opinion.

## 12.2    Calculation of Dose

Toxicologists are strongly discouraged from performing calculations to estimate the dose or total body burden of a drug other than alcohol, based on pharmacokinetic formulas that use postmortem blood concentrations and volume of distribution.  Such calculations are fraught with error, especially in postmortem cases where it may not be possible to accurately determine the blood level at the time of death, because of postmortem redistribution or related phenomena. The true volume of distribution of a drug is almost never known for any specific individual. For alcohol, sufficient research has been published that dose calculations may assist the courts, if the assumptions made are clearly stated.

## 13.    SAFETY

The laboratory should have a safety manual that addresses at a minimum the following issues:

* specimen handling, including the handling of infectious material and the disposal of biological specimens
* handling and disposal of solvents, reagents, and other chemicals in the laboratory
* handling and disposal of any radioactive materials used in the laboratory
* handling and disposal of laboratory glassware
* responses to personal injuries and spillage of biological specimens, chemicals, solvents, reagents, or radioactive materials
* regulation governing dress (e.g. laboratory coats and safety glasses), eating, drinking, or smoking in the laboratory.

Each laboratory must be aware of State and/or Federal Regulations that may exceed minimum standard established on the basis of the above considerations.

### Acknowledgements from 1991 Guidelines:

*We would not have been able to complete this task so promptly without the generous financial support of the Society of Forensic Toxicologists, Inc. and the Insurance Institute for Highway Safety.*

*The Committee, whose dedication and efforts are gratefully acknowledged, consisted of:*

> *Robert V. Blanke, Ph.D.*
> *Yale H. Caplan, Ph.D.*
> *Leo Dal Cortivo, Ph.D.*
> *Graham R. Jones, Ph.D.*
> *H. Horton McCurdy, Ph.D.*
> *Joseph R. Monforte, Ph.D.*
> *Michael A. Peat, Ph.D.*
> *Alphonse Poklis, Ph.D.*

Case 3:05-cr-30047-MAP    Document 29-6    Filed 01/09/2006    Page 26 of 26

SOFT / AAFS Forensic Laboratory Guidelines – draft 2006                    26.

*Richard W. Prouty, B.S.*
*Michael I. Schaffer, Ph.D.*
*Richard F. Shaw, B.S.*

1997/2002 SOFT/AAFS Laboratory Guidelines Committee:  Graham R. Jones, Ph.D. (Chair), W. Lee Hearn, Ph.D., H. Horton McCurdy, Ph.D. and J. Rod McCutcheon, B.S.

2005 SOFT/AAFS Laboratory Guidelines Committee: W. Lee Hearn, Ph.D.(Chair), Graham R. Jones, Ph.D., J. Rod McCutcheon, B.S., Barry K. Logan, Ph.D. and Robert A. Middleberg, Ph.D.

The Guidelines may only be modified by the Laboratory Guidelines Committee of the Society of Forensic Toxicologists and the Toxicology Section of the American Academy of Forensic Sciences as approved by the voting membership of both groups.

The Guidelines have been copyrighted by the Society of Forensic Toxicologists Inc. and by the American Academy of Forensic Sciences, Toxicology Section.